BROOKS M. PARKER, JAMES C. SCOTT, LILLIAN F. COLEMAN, et al., for themselves and as members and representatives of a class,

*vs.*

UNIVERSITY OF DELAWARE, a corporation existing under the laws of the State of Delaware, ELBERT N. CARVEL, et al., Members of the Board of Trustees of the University of Delaware, and others.

*New Castle, August 9, 1950.*

*Louis L. Redding,* and *Jack Greenberg,* New York City, for plaintiffs.

*Albert W. James,* Attorney General of the State of Delaware, and *William H. Bennethum,* Deputy Attorney General of the State of Delaware, for defendants.

SEITZ, Vice Chancellor: Stated realistically, the principal issue is this: Was the University of Delaware entitled to refuse these plaintiffs admission to the Arts and Science undergraduate school because they are Negroes and a state college for Negroes exists in Delaware and offers courses leading to the degrees which plaintiffs seek[1]?

The plaintiffs are Negroes residing in Delaware. In January, 1950 they requested that the University supply them with application blanks on which they desired to apply for admission to the undergraduate school at the University of Delaware (hereinafter called "University")[2]. Their requests were denied on the basis of a resolution

---

[1] I assume, as all counsel have done, that Delaware State College is a state college for Negro students.

[2] There is doubt that one plaintiff did apply, but that is not important to the disposition of this case.

which had been adopted by the Board of Trustees of the University on January 31, 1948. The resolution provides:

"Any colored resident of this State who is able to meet the established requirements for admission to the University of Delaware may be admitted to pursue a course of study of his choosing leading to a certain degree for which a course of study leading to the same degree is not furnished in any educational institution provided by this State within this State for the education of bona fide colored residents of this State."

Thereafter, plaintiffs, through a letter from their counsel, pointed out to the Trustees that the Delaware State College (hereinafter called the "College") had lost its accredited status and that there was in fact no equality between the University and the College. In consequence, plaintiffs' counsel made the following requests of the Trustees of the University:

(1) Application forms upon which formal requests for admission could be made by plaintiffs,

(2) That, when filled out and filed, these applications be considered and acted upon without reference to the race or color of the applicants,

(3) Notification to each applicant of the action taken upon his or her application.

The Trustees of the University by resolution dated February 18, 1950 formally denied such requests for the reasons that "it appears from said letter (as well as from the statutory, financial and factual history of Delaware State College) that the above-mentioned persons do not come within the scope of the Resolution adopted by this Board on January 31, 1948; * * *."

It thus appears that the Trustees decided in effect that since the plaintiffs desired to choose courses of study leading to degrees which were offered at the College, such plaintiffs were not' entitled to admission to the University[3].

---

[3] Negroes are now admitted to the Engineering, Graduate and Summer Schools at the University because these educational opportunities are not offered at the College.

It is quite apparent that the Trustees of the University, in refusing admission to the plaintiffs on the grounds stated, did not consider whether the College was equal in the constitutional sense to the University—the real issue in this case.

Thereafter, plaintiffs brought this action charging (1) that the Trustees of the University were not authorized by the Constitution of the State of Delaware or by any statute or law in force in Delaware to deny plaintiffs application blanks because of their color, and (2) the action of the Trustees violated, *inter alia,* the Equal Protection Clause of the 14th Amendment to the United States Constitution.

Plaintiffs pray for a permanent injunction restraining defendants from denying to plaintiffs and others similarly situated, the customary blanks upon which application may be made for admission to undergraduate study at the University; restraining the defendants from considering and acting upon the application blanks of plaintiffs and others similarly situated when filled out and returned to the University, upon grounds relating to the color or ancestry of the plaintiffs; restraining the defendants from enforcing a resolution, custom or usage whereby the plaintiffs and others similarly situated are excluded from admission to undergraduate work at the University.

The defendants have asserted three defenses to the complaint. They first contend that the complaint does not involve a class action. From this, I assume that they impliedly challenge the jurisdiction of this court. They next contend that the 14*th Amendment to the United States Constitution* has no application because the University is not a state institution. And finally, they contend that, assuming the 14*th Amendment to the Constitution* to be applicable, and conceding that separate segregated state facilities must be equal, nevertheless, the evidence fails to

show that the College is unequal to the University. I shall consider in order the three issues posed.

*Rule* 23(*a*) (3) *of the Court of Chancery* insofar as pertinent provides:

"(a) REPRESENTATION. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

\* \* \*

"(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

Defendants urge that there is no sufficiently well-defined class here present. I disagree. It seems to me that those Delaware Negroes who are legally interested in obtaining a college education and legally interested in a determination of their constitutional right with respect to admission to the University constitute a definite class within the meaning of the Rule of Court governing class actions.

Indeed, the Trustees by their ruling have created the class, and there is a certain irony in the suggestion of the Trustees' counsel that the class excluded is not sufficiently well defined. It has been repeatedly recognized that the class action rule should be liberally construed. See *Weeks v. Bareco Oil Co.*, (7 *Cir.*) 125 *F.* 2d 84. Moreover, defendants seem to think that plaintiffs' action must be a true class action. This is, of course, not so. The complaint itself indicates that this is a so-called spurious class action brought under *Rule* 23(*a*) (3).

Defendants next suggest that the right here sought to be enforced is a personal one and may not be the subject matter of a class action. Conceding that the right involved is a personal one, I cannot agree that the right here sought to be determined cannot properly be the subject matter of a class action. It seems to me, on the contrary, that a class action is particularly appropriate here because of the

question to be determined. The basic question to be decided involves the application of one of the great guarantees of the Constitution of the United States—the equal protection of the laws. No question of the individual qualifications of the members of the class is here involved. Thus, even assuming that the right sought to be enforced is personal, nevertheless, the plaintiffs are not thereby prevented from maintaining this class action.

Defendants next suggest that the "other persons similarly situated" must be a reality and not merely a possibility. I am prepared to take judicial notice of the fact that there are a substantial number of Negroes in Delaware whose positions are similar to those of the plaintiffs. Many of the students at the College and many of the June graduates of the Negro high schools may properly be considered to be in this class. Yes, the class is real enough.

I see no merit in the defendants' argument that this action involves federal substantive rights and cannot therefore be the subject matter of a class action. The case of *Sperry Products v. Association of American R. R., (D.C.)* 44 *F. Supp.* 660, relied on by defendants, certainly has no application to the present facts.

I therefore conclude that the present action is a proper class action under *Rule* 23. Such being the case, I conclude that this court clearly has jurisdiction because I find that at the present time it is not at all clear that there is a legal remedy in the form of a class action available in the law courts of Delaware. Indeed, the Superior Court omitted the class action rule in its recently adopted rules of court. Other bases of jurisdiction need not be considered.

Is the University a state institution? Before this question can be answered, it is necessary to consider the principles of law which govern the court in resolving such an issue. In many situations it has been stated that to

make a corporation a public one, its managers must not only be appointed by public authority but must be subject to its control. See 18 *C.J.S.*, *Corporations*, § 18; *Trustees of Dartmouth College v. Woodward*, 4 *Wheat.* 518, 671, 4 *L. Ed.* 629. However, to the extent that this matter involves the United States Constitution, the federal courts have held that they will not be governed merely by technical rules of law, but will appraise the facts in order to determine whether the members of the particular governing body may be classified as "representatives of the state to such an extent and in such a sense that the great restraints of the Constitution set limits to their action." See *Nixon v. Condon*, 286 *U.S.* 73, 52 *S. Ct.* 484, 487, 76 *L. Ed.* 984, 88 *A.L.R.* 458; *Smith v. Allwright*, 321 *U.S.* 649, 64 *S. Ct.* 757, 88 *L. Ed.* 987.

Having these principles in mind, let us first consider the origin and history of the University and then consider its present relationship to the State. An Academy was founded by a Presbyterian minister in 1744 at New London, Pennsylvania. Later it was moved to another site in Pennsylvania and it was not until 1765 that it was moved to Newark, Delaware, and its name changed to Newark Academy (Academy of Newark). Newark Academy continued in existence except for the revolutionary period and again for a short period from 1796 to 1799, until 1834. In 1824, the General Assembly of Delaware had authorized a lottery to raise money for the founding of a college. In 1833 by virtue of an Act found in *Vol.* 8, *Chapter* 257, *Laws of Delaware*, the Legislature chartered a college known as Newark College and directed that the proceeds of the lottery should be turned over to the new institution. In the Act creating Newark College, it was provided that the land owned by Newark Academy and the building about to be built thereon were also to be transferred to Newark College. This Act created a Board of not more than 33 Trustees, the original members of the Board being named in the statute with vacancies to be filled by the remaining members.

The powers of the Trustees and the purposes and powers of the corporation are set down in fairly broad terms. Certain other matters are also mentioned although there is no explicit language in the original act indicating that the College was to be a state institution. In 1843 its name was changed from Newark College to. Delaware College. It became the University in 1921.

Defendants suggest that the chief factor in determining whether the University is a private or public corporation is its origin. Assuming this is so, it seems to me that the origin of the University for legal purposes is the statute enacted in 1833. This statute was the original source of all the University's powers. The governing body was selected in its entirety by the State Legislature. Thus, not only was the corporation created by the State Legislature, and given its powers by the State and given money by the State, but its original Trustees were appointed by the State. Viewed solely from the point of view of its statutory origin, it seems entirely clear to me that the then Newark College, now the University, was originally an agency of the State of Delaware.

What is the present statutory relationship between the State and the University? Passing over the fact that educational organizations have treated the University as a State agency, it clearly appears that the president of the Board of Trustees and various presidents of the University have considered it to be a state agency. But of vital importance are the various statutes which have been passed and which deal with the University. I have already described its statutory origin. Many statutes have been passed since that time and several of those which are presently in effect must be mentioned. Thus the University was incorporated by the State. The control of the University is vested completely in a Board of Trustees; eight of the members of the Board are appointed by the Governor and are subject to confirmation by the Senate; twenty are elected by the Board of Trustees and are also subject to Senate confirma-

tion. The Governor, the president of the University, the master of the State Grange and the president of the State Board of Education are made *ex-officio* members of the Board; its quorum number, etc., are fixed by statute. From time to time the Legislature has changed the method of selecting the Trustees. See generally 1935 *Code, Chapt.* 72.

Many other statutes appearing in the 1935 *Code* might be mentioned. Thus, the objects of the University are described and a duty is imposed upon the University to maintain a college for the instruction and education of women. A Department of Education is to be created which is to be a part of the public school system of the State of Delaware and have for its object the education of teachers for the public schools of this State. There is a duty to integrate the courses into the total educational structure of the State. The University is also required to maintain a summer school for public school teachers of the State which shall be available tuition-free to all Delaware public school teachers.

The University is required to maintain a course in Agriculture and Horticulture and the courses are to be given free to all persons engaged in Agriculture and Horticulture in Delaware. It must also conduct a program of Agricultural Extension.

The University is required to maintain a Department of History, Political Science and Economics to be known as "State of Delaware, Chair of History" and students attending the University are required to take a special course in Delaware history. Other statutes require the University to provide certain other courses and to perform many other functions.

Of significant importance, the State has designated the University as the institution founded by the State to receive the benefits flowing from an Act of Congress providing for land grant colleges. The State has granted the University the power of eminent domain.

Other statutes require the president of the University to make an annual report on all aspects of the University to the Trustees who shall transmit the same to the Governor to be by him presented to the Legislature. The accounts of the Treasurer of the University are to be audited by the Auditor of Accounts in the same manner as the accounts of "other State officers." The buildings of the University are insured by the State and premiums are paid by the State Insurance Commissioner from State money.

The University prepares budgetory requests for each session of the Legislature. The State has, of course, annually appropriated large sums of money for the current maintenance of and for capital expenditures at the University. Although the University also receives large sums of money from non-State sources, it is not contended that this fact prevents the University from being considered a State agency. From its very statutory origin through the years up to the present time the Legislature has on innumerable occasions directed the activities of the University in a most material way.

The defendants point out that the University is not necessarily a state agency even though the University is given eminent domain power and State funds are appropriated for its maintenance. Conceding that this is so, such factors are nevertheless at least as consistent with the conclusion that a state agency exists as with a contrary conclusion.

The aforementioned statutes demonstrate beyond any reasonable doubt that under common law tests the State of Delaware has created a state agency at the University.

But if the question should be considered at all close on the basis of the common law test, then I think it is not at all close on the basis of the test required by the Supreme Court in *Nixon v. Condon, supra*. For purposes of determining the applicability of the Equal Protection Clause of the 14*th Amendment to the Constitution*, I am

definitely of the opinion that the University and its Trustees are representatives of the State of Delaware to an extent and in a sense sufficient to apply to them the great restraints required by the Constitution. Compare *Kerr v. Enoch Pratt Free Library*, (4 *Cir.*) 149 *F.* 2d 212, *certiorari* denied 326 *U.S.* 721, 66 *S. Ct.* 26, 90 *L. Ed.* 427.

I conclude that the University is an agency of the State of Delaware under the common law and under the constitutional test required by the 14*th Amendment*. The actions of its Trustees must be judged in that light.

Counsel for plaintiffs have explicitly stated that they do not press the allegation in their complaint that the action of the Trustees was not authorized by either the Delaware Constitution or laws. For purposes of this decision, therefore, I shall assume, without deciding, that the Trustees of the University were entitled under Delaware law to refuse admission to these Delaware Negroes solely because of their race. The crucial question is whether, as plaintiffs contend, this refusal, when considered in connection with the College, conflicts with the 14*th Amendment to the Constitution of the United States* which, *inter alia*, provides: "nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws."

In *Plessy v. Ferguson*, 163 *U.S.* 537, 16 *S. Ct.* 1138, 41 *L. Ed.* 256, decided in 1896, the United States Supreme Court decided in effect that a state could practice segregation so long as the segregated facilities were equal. As recently as June of this year the United States Supreme Court applied the separate but equal test in two cases involving graduate and professional schools. See *Sweatt v. Painter*, 70 *S. Ct.* 848; *McLaurin v. Oklahoma State Regents for Higher Ed.*, 70 *S. Ct.* 851. In the *Sweatt* case the Supreme Court stated that it found it unnecessary to review the separate but equal doctrine laid down in the *Plessy* case.

In resolving this case, I shall assume, along with counsel, that the College is for Negro students and the University

for "white" students to the extent that the State is permitted to impose segregation under the United States Constitution.

Plaintiffs claim that the College is inferior to the University on two counts: (1) Being a segregated school, the College cannot be an equal school; and (2) apart from the question of segregation, the College is markedly inferior to the University.

As to (1) the defendants say that segregation *per se* is not unlawful and as to (2) the defendants take the position that the facilities at the University and at the College are substantially equal. This presents a factual conflict which can only be resolved by examining and comparing the two institutions in some detail.

Under the present state of the decisions of the United States Supreme Court construing the Equal Protection Clause of the United States Constitution, I do not believe I am entitled to conclude that segregation alone violates that clause. I therefore pass over plaintiffs' first contention that a segregated school cannot be an equal school. See *Boyer v. Garrett,* (4 *Cir.* ) 183 *F. 2d* 582.

I now consider whether, apart from the isolated question of segregation, the College is equal to the University within the constitutional requirement that segregated facilities must be equal.

Preliminarily, it is necessary to point out that while the Supreme Court test of separate but equal facilities sounds fine in theory, it is most difficult to apply in practice. The difficulty comes principally from the fact that the separate facilities invariably have marked degree differences arising from the respective sizes of the institutions compared. Also, many intangible factors help to make up an educational institution in its totality. The United States Supreme Court has not only so recognized but has indicated that such factors are highly pertinent. However, these

intangible factors, such as the reputation of the school, the prestige of the faculty, the beauty of the campus, etc., are difficult to measure on the scales of justice.

Let us first consider the more substantial evidentiary factors concerning the College and the University.

The University has capital assets of approximately $13,000,000 available to its students, while the College has less than $600,000 so available. The per capita capital assets at the University are about double those at the College. Expert witnesses testified without contradiction that there is such a degree of correlation between capital assets and educational opportunity that two schools, of such disparity in capital assets, could not be expected to be equal.

Accompanied by counsel, I visited the College and the University and examined practically all of the relevant capital assets. It is my conclusion from that visit that even allowing for the difference in the sizes of the two institutions because of the number of students, nevertheless, the quality and condition of the capital assets at the College are in fact grossly inferior to those at the University.

The campus at the University is a thing of beauty. I say this based on my visit and not unmindful of the necessity for objectivity because of my own undergraduate background. The beauty of the campus arises from the obvious quality of the many substantial buildings and from the striking symmetry created by the landscaping and the overall architectural uniformity. An examination of the various buildings demonstrated to me, with a few exceptions, that the physical plant at the University is of a very high quality. Indeed, the University's acting president, when testifying, took an obvious and commendable pride in the excellence of the University's physical plant and equipment. In contrast, the campus at the College left one with the feeling that there was no particular plan behind the positions of the various buildings. Moreover, an examination of the buildings themselves led me to conclude that with very

few exceptions the few good buildings at the College were inferior to nearly all of the comparable buildings at the University. One came away from the College with the feeling that here was an institution which, even without comparison, was a most inadequate institution for higher learning.

I conclude from the testimony and my visit to the two institutions that the physical facilities at the College are vastly inferior to those at the University and that such inferiority has no relationship to the sizes of the respective student bodies. Most of these facilities are used in varying degrees by students in the School of Arts and Science.

I now look to the curricula offered at the two institutions. It is obvious that at the heart of this problem is the question as to whether the State shall give all of its citizens equal educational opportunities. With this in mind it is important to see what the University offers to its students and what the College offers to its students. Of course, it must be recognized that under the present educational scheme students "major" in certain fields. Apparently this practice is now identified as a "field of concentration." Since this suit involves admission to the School of Arts and Science at the University, it is pertinent to note that the University offers students an opportunity to concentrate in 18 fields and in 5 related subjects in the School of Arts and Science. The University also offers Bachelor of Science degrees in Business Administration, Chemistry, Physics, Medical Technology, Agriculture, Education, Engineering and Home Economics. The catalogue of the College offers fields of concentration in 8 subjects in pursuance of the Bachelor of Arts and Bachelor of Science degrees in the divisions of Language and Literature, Social Science, Natural Science and Mathematics. It also apparently offers fields of concentration in 5 educational fields. The testimony clearly convinced me that while these fields of con-

centration appear in the catalogue of the College, many of the courses and facilities necessary to pursue these fields of concentration are not in fact available at the College. Thus, I conclude that based on the comparative number of fields of concentration offered and in fact available, the educational opportunities offered in this important respect at the College are vastly inferior to those offered at the University.

One is also struck by the gross disparity between the richness and variety of particular courses offered at the University and at the College. An examination of the bulletins of the two schools reveals that the University offers many, many courses which are not offered at the College. Not only are more and different courses offered at the University, but the difference in depth and intensity is markedly great. Thus, it appears that a large number of seminar courses are available at the University while no seminar courses are offered at the College. All the witnesses agreed that seminar courses are valuable because they provide for closer contact between teacher and student and because they involve a more intimate interchange of ideas among the students. Defendants' counsel suggest that this marked deficiency is removed at the College because of the small number of students in the classes. This suggestion by the defendants' counsel loses sight of the real importance of seminar work, since the emphasis in seminar work is on individual effort and the exchange of ideas by the students in a non-classroom atmosphere. It is rather shocking that at this stage in the progress of higher education in Delaware many of its citizens do not have available to them in their college work anything resembling seminar courses.

I conclude that the curricula offered and available at the College is greatly inferior to that offered and available at the University.

Let us next consider the faculties of the two institu-

tions. This comparison may be demonstrated more graphically by the following table:

| University of Delaware | Delaware State College |
|---|---|
| *Rank* | *Rank* |
| 48 Professors, 33 Associate Professors | 4 Full Professors (2 in related fields) |
| *Training* | *Training* |
| 77 Doctors, 112 Masters 58 Bachelors | 4 Doctors, 21 Masters, 6 Bachelors |
| *Salary Distribution* | *Salary Distribution* |
| $3,000 to $6,700 | $2,250 to $4,300 |
| *Scholarship of Faculty* | *Scholarship of Faculty* |
| Research—full time and part time | None |
| Encouragement of research by administration | No encouragement |
| Honors (Presentation of papers to honorary societies, etc.) | No distinction |
| Bibliography and scholarly publications | No bibliography, no publications |
| *Teaching Load* | *Teaching Load* |
| 12 hours | 15 hours |
| Faculty stimulated by Graduate School | No Graduate School |
| *Tenure* | *Tenure* |
| Instructor—1 year | Year to year, for all faculty members |
| Assistant Professor—3 years | |
| New Associate Professor—3 years | |
| Associate Professor—renewing contract—5 years | |
| Full Professor—without term | |

The foregoing table reveals that, apart from differences based on the sizes of the two student bodies, the faculty at the College compares most unfavorably with the faculty at the University in the respects designated. Analyses of the various statistics by the expert witnesses amply justify this conclusion. The testimony before me demonstrated that the salary scale at the College was so low that the College could not compete successfully with the local public

school system. While this situation is on the mend, so to speak, the overall situation still places the College below the University. One cannot but note the shocking lack of tenure at the College. I therefore conclude that an analysis of the faculty at the two institutions demonstrates that the faculty is vastly inferior at the College in the important respects indicated.

We next consider the libraries. Along with the faculty the library constitutes the "heart" of any educational institution. All the educators so testified and the soundness of this conclusion is self-evident.

The University has more than 140,000 volumes, housed in a magnificent structure which is well lighted and beautifully situated. The University's library contains cubicles for isolated study and it contains a periodical room which makes available to the students a tremendous variety of periodicals. It also provides students with records of great operas, records to study various foreign languages and many other things. On the other hand, the College library contains 16,000 volumes. The experts testified that this number of volumes was, in and of itself, insufficient to meet even minimum requirements for a college of this type. Many of the volumes are piled on the floor because there apparently is inadequate space to house them. Its periodical selection does not even compare with that found at the University. It would be a waste of time to amplify the overwhelming inferiority of the library at the College to the library at the University. Indeed, the College library was originally designed as a chapel. I conclude that in this very important respect the College is inferior to the University.

Plaintiffs contend that the educational opportunities offered at the College are inferior to those offered at the University because the University is accredited and the College is not. The testimony before me clearly indicates that a graduate of an unaccredited school is often at a

distinct disadvantage. Some of these disadvantages arise in attempting to transfer to another undergraduate institution, in attempting to enter graduate or professional school and in seeking employment. The disadvantages arise because school authorities and employers generally give persons from unaccredited institutions less consideration than those coming from accredited schools. This is understandable because most reputable educational institutions are accredited. This means that the institution is being conducted in accordance with certain standards which have been determined to be acceptable for educational institutions.[4] One expert witness of prominence testified that in this day and age when there are many more applicants for admission to graduate and professional schools than there are available places the school authorities quite often commence their selection process by eliminating applicants from unaccredited schools. The possible adverse effect of this practice on graduates from the College is not difficult to comprehend.

I am convinced that a student applying for admission to a graduate or professional school or seeking employment may well be handicapped if he comes from an unaccredited school. Students coming from the University are not subject to this substantial handicap. I therefore conclude that the educational opportunities offered at the College are not equal to those offered at the University because the University is accredited and the College is not.

The two institutions may be compared in many other respects. The administration of the University is so far superior to that existing at the College that it almost defies comparison. The scope of the duties of the various administrative officers at the University are well defined,

---

[4] These standards are adopted by certain organizations which examine institutions to see if they meet such standards. The University is accredited by the Middle States Association, National Association of State Universities, The Association of American Universities, etc.

while the duties of the various officers at the College are vague in many instances.

I merely mention several other important ways in which the College is inferior to the University. Thus, the University provides a fairly elaborate student personnel service to assist the students in securing employment during attendance and after graduation—the College has none.

The University possesses a division of health, a health building, an infirmary and a medical staff including nurses. All the College has is a doctor on call and a most inadequate infirmary.

Disparities also appear in the maintenance staffs of the two institutions. It may be noted that maids clean the dormitories at the University, while the students do this work at the College. At the University, athletic facilities exist in abundance, including swimming pools and gymnasia, while at the College neither a swimming pool nor a gymnasium can be found. The State by statute has created certain chairs of learning at the University, while it has created none at the College. The State created scholarships and prizes at the University including some 33 funds, while there is just one scholarship fund at the College.

Although the facilities at the College are even inadequate in most respects when judged by any reasonable educational standards, it must be remembered that the test here is whether they are equal to those provided at the University. Defendants' counsel, in seeking to justify the adequacy of many of the facilities at the College, overlook this important fact.

The various matters discussed and compared demonstrate the all-pervading manner in which the College is inferior to the University. Thus, whether the two institutions are compared item by item or in their totalities the same conclusion inescapably appears. The College is woe-

fully inferior to the University in the physical facilities available to and in the educational opportunities offered its undergraduates in the School of Arts and Science. In consequence, the State of Delaware is not providing these plaintiffs and others similarly situated with educational opportunities at the College which are equal to those provided at the University.

It follows from my conclusions that the Trustees of the University by refusing to consider plaintiffs' applications because they are Negroes have violated the guarantee contained in the Equal Protection Clause of the United States Constitution. The plaintiffs are therefore entitled to a permanent injunction in accordance with the prayers of their complaint.

Order on notice.