ETHEL LOUISE BELTON, an infant, by her Guardian *ad litem,* Ethel Belton, et al.,

*vs.*

FRANCIS B. GEBHART, et al.

SHIRLEY BARBARA BULAH, an infant, by her Guardian *ad litem,* Sarah Bulah, et al.,

*vs.*

FRANCIS B. GEBHART, et al.

*New Castle, April 1, 1952.*

*Louis L. Redding,* and *Jack Greenberg,* of New York City, for plaintiffs.

*H. Albert Young,* Attorney General, and *Louis J. Finger,* Deputy Attorney General, for defendants.

SEITZ, Chancellor: The question for decision in both cases here presented is whether the State of Delaware, through its agencies, has violated the plaintiffs' rights under the equal protection clause of the Fourteenth Amendment to the United States Constitution.

Two actions were filed. They were consolidated for trial purposes and are here being decided. Although the plaintiffs sued by guardians *ad litem,* I shall embrace only the minors when referring to "plaintiffs."

In the first action the plaintiffs are eight minors who sue on behalf of themselves and others similarly situated. Plaintiffs are Negroes and residents of the Claymont Special School District in New Castle County, Delaware. They have been refused admission to the Claymont High School, a pub-

lic school maintained by the State of Delaware for white children only. They applied for and were expressly refused the right to attend the Claymont High School solely because of their color and ancestry. However, plaintiffs are permitted to attend Howard High School and Carver Vocational School, both operated under a single administration, by the Wilmington Special School District. Howard High School and Carver Vocational, for Negro children, are located in the city of Wilmington approximately nine miles from the residences of these plaintiffs.

Incidentally, the Wilmington School District is not under the jurisdiction of the State Board of Education, and its members and agencies are not parties. The "arrangement" between the State Board and the Wilmington Board is completely informal. Consequently the State Board could not compel the Wilmington Board to take any action, nor could this court compel the Wilmington Board to act since it is not a party.

Plaintiffs, including the guardians, belong to a class which, when its members own real property, are subjected to tax levied on such property to meet obligations on bonded indebtedness incurred in connection with the construction of the Claymont High School.

Plaintiffs contend that the State of Delaware, through its designated agencies and agents, has violated plaintiffs' rights under the equal protection clause of the Fourteenth Amendment in that: (1) State-imposed segregation in education is itself in violation of the Fourteenth Amendment, and (2) the facilities and educational opportunities offered to the plaintiffs, and those similarly situated, are inferior to those available to white students similarly situated.

Defendants deny that segregation in education, in and of itself, violates the Fourteenth Amendment, and they deny that there is any substantial disparity between the facilities and educational opportunities offered the plaintiffs and white children similarly situated.

The second action was brought by a seven year old child residing near Hockessin, Delaware. Plaintiff is a Negro. She was refused admission to Hockessin School No. 29, a free public elementary school maintained for white children by the State of Delaware, solely because of her color and ancestry. Plaintiff is permitted to attend Hockessin School No. 107, an elementary school maintained for Negro children in the same general geographic area as the Hockessin School No. 29.

Plaintiff and defendants in the second action, make the same charges and defenses as are contained in the first case.

It is not disputed that under *Article X, Section* 2 of the *Delaware Constitution,* and under 1935 *Code, Paragraph* 2631 the State has directed that there be separate free school systems for Negroes and whites. The questions here presented follow:

(1) Are the constitutional provision and the statute, in so far as they provide for segregation, in and of themselves in violation of the Fourteenth Amendment to the United States Constitution?

(2) Assuming a negative answer to question (1), are the separate facilities and educational opportunities offered plaintiffs equal to those furnished white children similarly situated?

### Segregation *Per Se*

At stated, plaintiffs' first contention, and this applies to both cases, is that the evidence demonstrates that the refusal to permit plaintiffs and members of their class to attend schools for white children similarly situated, results in their receiving educational opportunities markedly inferior to those offered white children. This consequence flows, say plaintiffs, solely from the fact that they are Negroes. Simply stated, plaintiffs contend that the evidence shows that legally enforced segregation in education, in and of itself, prevents the Negro from receiving educational opportunities which are "equal" to those offered whites.

Plaintiffs produced many expert witnesses in the fields of education, sociology, psychology, psychiatry and anthropology. Their qualifications were fully established. No witnesses in opposition were produced. One of America's foremost psychiatrists testified that State-imposed school segregation produces in Negro children an unsolvable conflict which seriously interferes with the mental health of such children.[1] He conceded that the form, or combination of forms of hardship, vary in different cases and he further conceded that the results are not caused by school segregation alone. However, he pointed out that State enforced segregation is important, because it is "clear cut" and gives legal sanction to the differences, and is of continuous duration. He also pointed out other factors which viewed against the social background of the Delaware community, necessarily have the effect of causing the Negro child to feel that he is inferior because, in an indirect fashion, the State has said so. The other experts sustained the general proposition as to the harmful over-all effect of legally enforced segregation in education upon Negro children generally. It is no answer to this finding to point to numerous Negroes who apparently have not been so harmed. It leads to lack of interest, extensive absenteeism, mental disturbances, etc. Indeed, the harm may often show up in ways not connected with their "formal" educational progress. The fact is that such practice creates a mental health problem in many Negro children with a resulting impediment to their educational progress.

Defendants say that the evidence shows that the State may not be "ready" for non-segregated education, and that a social problem cannot be solved with legal force. Assuming the validity of the contention without for a minute conceding the sweeping factual assumption, nevertheless, the contention does not answer the fact that the Negro's mental health and, therefore, his educational opportunities are ad-

---

[1] At least two of the experts examined some Delaware children and while not at all conclusive, their findings gave some support to the conclusions reached.

versely affected by State-imposed segregation in education. The application of constitutional principles is often distasteful to some citizens, but that is one reason for constitutional guarantees. The principles override transitory passions.

█ I conclude from the testimony that in our Delaware society, State-imposed segregation in education itself results in the Negro children, as a class, receiving educational opportunities which are substantially inferior to those available to white children otherwise similarly situated.

But my factual conclusion does not dispose of the first question presented. I say this because it is necessary to consider the decisions of the United States Supreme Court construing the Fourteenth Amendment as they apply to this general problem. Specifically, I must decide whether such a finding of fact as I have here made, is a proper basis for holding that such separate facilities cannot be equal. In other words, can the "separate but equal" doctrine be legally applied in the fields of elementary and secondary education?

Plaintiffs say that the situation here presented has never been passed upon by the United States Supreme Court, or the Supreme Court of Delaware, and so is an open question. I agree with the plaintiffs that the Supreme Court has not, so far as I can find, passed upon a case containing a specific finding as to the effect on the Negro, educationally, of State-imposed segregation in education. The question, however, which judicial integrity requires me to answer is this: Has the U. S. Supreme Court by fair or necessary implication decided that State-imposed segregated education on the grammar and high school levels, in and of itself, does not violate the Fourteenth Amendment?

█ The United States Supreme Court first announced what has come to be known as the "separate but equal" doctrine in *Plessy v. Ferguson,* 163 *U.S.* 537, 16 *S.Ct.* 1138, 1144, 41 *L.Ed.* 256. It is, of course, true that that case involved a railway car situation. However, the defendants rely most strongly on *Gong Lum v. Rice,* 275 *U.S.* 78, 48 *S.Ct.* 91,

72 *L.Ed.* 172, decided by the U. S. Supreme Court in 1927. In that case a Chinese citizen was required to attend an elementary school for Negroes in Mississippi, even though he claimed that he was entitled to admission to the school for whites. The court accepted the conclusion that he was "colored" and stated that the facilities available for Negroes, and therefore available to the Chinese plaintiff, were equal to those offered to the whites. Thus, the question was whether the State was required, under those circumstances, to admit him to the school for white children. The Supreme Court held that the State was not so required, citing many cases for the proposition that such a practice was within the constitutional power of the State, without interference because of the United States Constitution. It is true that there was no proof in that case concerning the effect of such State-imposed segregation on Negroes. But it seems to me that the very use of the "separate but equal" doctrine in an elementary school case, has implicit therein a recognition that in such a case there can be separate but equal educational opportunities in a constitutional sense. Of course, this could not be true were my finding of fact given constitutional recognition, but if it were, the principle itself would be destroyed. In other words, by implication, the Supreme Court of the United States has said a separate but equal test can be applied, at least below the college level. This court does not believe such an implication is justified under the evidence. Nevertheless, I do not believe a lower court can reject a principle of United States constitutional law which has been adopted by fair implication by the highest court of the land. I believe the "separate but equal" doctrine in education should be rejected, but I also believe its rejection must come from that court.

My legal conclusion is not inconsistent with my finding of the fact on this point, because by applying the "separate but equal" test, the Supreme Court has said in effect that inequality arising from segregation itself is not that type of inequality which violates the United States Constitution.

While not set forth in so many words, it seems to me that many other lower courts have followed this same reasoning in reaching a similar conclusion. See, e. g., *Briggs v. Elliott,* *(D.C.)*, 98 *F.Supp.* 529, appeal pending; cf. *Davis v. County School Board of Prince Edward County, (D.C.E.D.Va.)*, 1952, 103 *F.Supp.* 337. Plaintiffs point to a decisional trend from which they would have this court conclude that the "separate but equal" doctrine as applied to education should be rejected. Certainly such a trend is "in the wind" but, as stated, it is for the Supreme Court to say so in view of its older, and as yet, unrepudiated decisions. See *Parker v. University of Delaware*, 31 *Del.Ch.* 381, 75 *A.2d* 225.

I, therefore, conclude that while State-imposed segregation in lower education provides Negroes with inferior educational opportunities, such inferiority has not yet been recognized by the United States Supreme Court as violating the Fourteenth Amendment. On the contrary, it has been by implication excluded as a constitutional factor. It is for that court to re-examine its doctrine in the light of my finding of fact. It follows that relief cannot be granted plaintiffs under their first contention.

### Separate But Equal.

We turn now to a consideration of the second question, to-wit, are the separate facilities and educational opportunities offered these plaintiffs, and those similarly situated, equal to those furnished white children similarly situated?

The issues on this point can best be resolved by first setting forth the facts as I find them, based on the testimony and exhibits, plus the inspection which I made of all the structures involved. I first consider the High School case.

### Claymont High Versus Howard High and Carver Vocational.

One of the eight Negro plaintiffs in the so-called Claymont versus Howard Carver case, is Ethel Louise Belton. She lives in Claymont. Each morning about quarter of or

ten minutes of 8:00 she leaves her home north of Claymont to travel to Howard High School in Wilmington. She walks a distance to the Philadelphia Pike where she takes a public bus to Wilmington. The entire trip one way consumes about fifty minutes.

She takes, *inter alia,* a business course requiring two hours, two days a week. For this course she must leave Howard High building at the end of the regular school hours, and travel to the so-called Carver Vocational building (under Howard administration), a distance of nine and one half city blocks. This course is not given in the Howard building itself. This trip consumes about fifteen minutes one way. A similar course is given at Claymont. She is also engaged in the study of the piano after school.

If she were white she could attend Claymont High School which is about a mile and a half from her home. If she walked to Claymont High School she would have for other use, an extra half hour each afternoon, plus extra time in the morning otherwise spent in travel. If she took the bus to the Claymont school she would have still more time.

Plaintiffs produced an expert witness who testified that bus travel increased fatigue and irritability, thereby impairing the learning process. Also it was pointed out that this infant plaintiff's travel time consumes about 25% of a most valuable block of the child's time, that which permits self-initiated activities, roughly, the hours from three to five in the afternoon.

I turn now to a comparison of the Claymont plant versus the Howard-Carver plant.

The Claymont building and the Howard building are both fairly good, with neither suffering by a comparison, except that for its purpose, Claymont has an admitted advantage over Howard with respect to the gymnasium. The same general equality, however, is not true of the Carver building which is a part of the Howard administration. It is an old building without an auditorium, gymnasium or regular

cafeteria. The makeshift cafeteria is in a dingy basement and has neither seats nor tables. Carver has but one lavatory which has an unsanitary cement floor. It goes without saying that students traveling from Howard to Carver are not protected from the weather.

Claymont is located on a fourteen acre site, containing ample room for playground and equipment, as well as for sports of most any character. Aesthetically speaking it is very attractive. The Howard structure is located on a three and one half acre site with inadequate playing space, even considering the use of the public park with its restrictions. The Howard building is flanked by industrial buildings and poor housing. The area surrounding the Carver site is even more congested. There is no land in front, or play space in the rear.

An analysis of the teaching staffs at Claymont and Howard reveals that at Claymont 59.00% have master's degrees. At Claymont 41% have bachelor's degrees, while approximately 52% have such degrees at Howard. There are none at Claymont without degrees while Howard has 9.4% of its faculty without degrees. It appears that of those of the Howard foculty without degrees one teaches a vocational subject, another wood working, and a third physical education.

In so far as the sizes of the classes at the two high schools are concerned, the comparative figures are as follows:

|  | Claymont | Howard |
|---|---|---|
| English | 25.56 | 32.26 |
| Foreign Languages | 25.75 | 31.10 |
| Home Economics | 16.2 | 24.71 |
| Industrial Arts | 17.14 | 23.9 |
| Mathematics | 30.60 | 33.25 |
| Natural Sciences | 34.87 | 32.26 |
| Physical Education | 24.28 | 43.67 |
| Social Studies | 33.88 | 32.05 |

The "average" teacher at Howard carries a teaching load of 178 pupils per week, while at Claymont the figure is 149 pupils per week. In so far as Physical Education classes are concerned there is a tremendous disparity in favor of Claymont.

Turning to the academic subjects, plaintiffs contend that courses in Public Speaking, Spanish, Mathematics Review, Trigonometry, and Economics and Sociology are not offered at Howard but are offered at Claymont.

Defendants point out that in general practice, each school offers only one foreign language. For a period of time Claymont offered Spanish as its modern foreign language but it is now shifting back to French. The fact that for one year Claymont has both French and Spanish (second year) is caused only by the shift from Spanish to French.

Defendants say that the subject matter of the course called Economics and Sociology is offered at Howard as "Problems in Democracy."

Defendants contend that the course offered at Claymont entitled "Mathematics Review" is only for those too lazy or too dull to continue the study of mathematics, and is a sort of "open air course."    -

Defendants argue that, contrary to plaintiff's contention, trignometry is offered at Howard, and that, in fact, one student is now being taught trignometry. Defendants say the course will be offered at Howard if there is any demand for it.

It is true that no public speaking course is offered at Howard. However, it appears that debating is available at Howard and Howard does offer related English in some vocational courses.

Although Claymont and Howard have trained librarians Carver does not. In fact, Carver's librarian has a degree from an unaccredited school.

Claymont has many more extra curricular activities than does Howard. Thus, Claymont has a school newspaper, an Art Club, Drivers Club, Mathematics Club, Square Dance Club, Leaders Corps and an organization to tickle the imagination called "Tumbling Girls." Howard has only a Story Hour, a Science Club, and a French Club.

I now consider whether the facilities of the two institutions are separate but equal, within the requirements of the Fourteenth Amendment to the United States Constitution. Are the separate facilities and educational opportunities offered these Negro plaintiffs, and those similarly situated, "equal" in the constitutional sense, to those available at Claymont High to white children, similarly situated? The answer to this question is often much more difficult than appears, because many of the factors to be compared are just not susceptible of mathematical evaluation, e. g., aesthetic considerations. Moreover, and of real importance, the United States Supreme Court has not decided what should be done if a Negro school being compared with a white school is inferior in some respects and superior in others. It is easy, as some courts do, to talk about the necessity for finding substantial equality. But, under this approach, how is one to deal with a situation where, as here, the mental and physical health services at the Negro school are superior to those offered at the white school while the teacher load at the Negro school is not only substantially heavier than that at the white school, but often exceeds the State announced educationally desirable maximum teacher-pupil ratio. The answer, it seems to me is this: Where the facilities or educational opportunities available to the Negro are, as to any substantial factor, inferior to those available to white children similarly situated, the constitutional principle of "separate but equal" is violated, even though the State may point to other factors as to which the Negro school is superior. I reach this conclusion because I do not believe a court can say that the substantial factor as to which the Negro school is inferior will not adversely affect

the educational progress of at least some of those concerned. Moreover, evaluating unlike factors is unrealistic. If this be a harsh test, then I answer that a State which divides its citizens should pay the price.

Thus, I ask, are the facilities and educational opportunities at Howard-Carver inferior to those offered at Claymont as to any substantial factor? The answer to this question requires an analysis of the facts as I have found them.

From the points of view of location and landscaping and overall aesthetic considerations, Claymont is vastly superior to Howard-Carver. But defendants' counsel say that the differences are almost inevitable in any comparison of urban and suburban schools. Granting that this may be so, it only goes to demonstrate the dreary fact that segregated education, as here provided, means that white children in the Claymont school district may have the benefits which flow from living in the suburbs, but Negro children similarly situated may not. In other words, according to defendants, white parents may move into the Claymont suburbs in order to give their children the benefits which flow from attending a suburban school, but Negro parents may not. The cold, hard fact is that the State in this situation discriminates against Negro children. The court fully realizes that there are many white children who do not have the advantages which are provided at the Claymont School, but the point is that they are not white children whose position is otherwise similar to that of these plaintiffs. As the Supreme Court has said, there is a vast difference—a constitutional difference.

Plaintiffs next point to the fact that part of the curriculum is offered at Howard and part at Carver; that these schools are some distance apart and that the facilities at Carver are markedly inferior to those available at Claymont for similar courses. I find as a fact from the record and from my visit, and defendants tacitly concede, that the facilities at Carver, with due regard for its vocational emphasis, are woefully inferior to those available at Claymont. A further repetition of the comparative facts is better forgotten.

The teacher training at Claymont is substantially superior to that at Howard-Carver, as the comparative figures demonstrate.

The teacher load at Howard-Carver is substantially greater than that at Claymont. Many more of the classes at Howard-Carver exceed the twenty-five to one student-teacher ratio, than at Claymont. Moreover, the twenty-five to one ratio has been fixed by the State educational authorities as a desirable maximum.

■ I conclude that with respect to teacher training, pupil-teacher ratio, extra curricular activities, physical plants and aesthetic considerations, the Howard-Carver School is inferior to Claymont under the "separate but equal" test. These factors are all a part of the educational process, as the experts stated.

One other factor of importance remains to be considered. At least one of the plaintiffs travels, by foot and by public bus, over nine miles each way to attend Howard, whereas she could reach Claymont by traveling somewhat over one mile. Thus, a substantial portion of the plaintiff's time is taken traveling to and from school. Indeed, it is much more time than is taken by white children similarly situated.

■ I recognize that some authorities have refused to recognize the travel factor as justifying a holding of inequality,[2] however, I do not believe that those cases involved the burden time-wise and distance-wise which is here involved. I find that, under the facts here presented, the requirement that plaintiffs travel such a distance while whites similarly situated are subjected to no such burden, results in inferior educational opportunities for these plaintiffs because of time and fatigue factors.

---

[2] See *Brown v. Board of Education*, (*D. C.*) 98 *F. Supp.* 797, appeal pending. *Dameron v. Bayless*, 14 *Ariz.* 180, 126 *P.* 273; *People vs. Gallagher*, 93 *N. Y.* 438. Defendants also cite *Gong Lum v. Rice*, 275 *U. S.* 78, 48 *S. Ct.* 91, 72 *L. Ed.* 172, for this proposition, but I believe the language of the opinion negatives any such sweeping generalization.

I have enumerated the several respects in which I have found the facilities and educational opportunities at Howard-Carver to be inferior to those offered at Claymont. Viewing such factors, both independently and cumulatively, I conclude that the separate facilities and opportunities offered these plaintiffs, and those similarly situated, are not equal to those offered white children in the Claymont District, and that, in consequence, the State by refusing these plaintiffs admission to Claymont solely because of their color, is violating the plaintiff's rights protected by the equal protection clause of the Fourteenth Amendment.

However, the defendants' counsel say that the evidence demonstrates that the Wilmington Board of Education plans to abandon Carver, and transfer its courses to the Howard building. It also intends to make Howard a senior high school, and remove the crowded condition of that school by creating a junior high school for Negroes at what is now the Bancroft School for whites. A new high school for Negroes at Middletown is supposed to help. The evidence shows that some of the building program is under way, while other parts of it are merely in the planning stage.

Under these circumstances, defendants urge that even though the court should find inequalities, it should do no more than direct the defendants to equalize facilities and opportunities, and give them time to comply with such an order. Passing over the fact that the Wilmington Board is not before this court, there are three reasons why I cannot agree with this approach. (1) I do not see how the plans mentioned will remove all the objections to the present arrangement. (2) Moreover, and of great importance, I do not see how the court could implement such an injunction against the State. (3) Just what is the effect of such a finding of a violation of the Constitution, as has here been made. It is true that in such a situation some courts have merely directed the appropriate State officials to equalize facilities. I do not believe that such is the relief warranted by a finding that the United States Constitution has been violated. It

seems to me that when a plaintiff shows to the satisfaction of a court that there is an existing and continuing violation of the "separate but equal" doctrine, he is entitled to have made available to him the State facilities which have been shown to be superior. To do otherwise is to say to such a plaintiff: "Yes, your constitutional rights are being invaded, but be patient, we will see whether in time they are still being violated." If, as the Supreme Court has said, this right is personal,[3] such a plaintiff is entitled to relief immediately, in the only way it is available, namely, by admission to the school with the superior facilities. To postpone such relief is to deny relief, in whole or in part, and to say that the protective provisions of the constitution offer no immediate protection.

I conclude that the State's future plans do not operate to prevent the granting of relief to these plaintiffs by way of an injunction, preventing the authorities from excluding these plaintiffs, and others similarly situated, from admission to Claymont High School on account of their color. If it be a matter of discretion, I reach the same conclusion. If, at some future time, defendants feel that they can demonstrate that all the constitutional inequalities have been removed, then it would be for them to take the initiative.

School No. 29 (White) Versus School No. 107 (Negro).

Let us now compare School No. 29 (for white children), nad School No. 107 (for Negroes).

No. 29 is a four classroom building constructed in 1932 at a cost of $55,000.00, with a present value of about $77,-000.00. No. 107 is a one room building converted by a sliding partition into two rooms. It was constructed in 1922 at a cost of $21,000.00 and has a present value of $13,000.00. This obvious appreciation in the value of the white school, versus the depreciation in the value of the Negro school, reflects, aside from their age, differences in maintenance, up-

---

[3] See *Sweatt v. Painter*, 379 *U. S.* 629, 70 *S. Ct.* 848, 94 *L. Ed.* 1114.

keep and improvements. Until recently the white school was unlawfully favored in the receipt of State funds. The first six grades are taught at each school. However, at No. 107 each teacher has three grades while at No. 29 each teacher has only two grades. This is significant apart from the over-all number of children taught.

No. 29 has a very attractive auditorium, as well as a basketball court, a partial basement which provides storage space and more adequate space for heating and hot water. No. 107 has none of these. The auditorium serves a valuable purpose as the happenings on the occasion of my visit demonstrated.

No. 29 has several of the accepted forms of drinking fountains. No. 107 does not. No. 29 has modern spacious sanitary toilet facilities, while No. 107 has one commode in a very small room which adjoins the space where the children's lunches, the janitorial materials and the school drinking water bottles are kept. No. 29 has a well equipped nurse's office, while No. 107 has only a first aid packet. The fire protection facilities at No. 29 are more numerous than those at No. 107. No. 29 is also superior in other items too numerous to mention.

No. 29 is so beautifully situated that the view immediately catches the eye. The landscaping is also outstanding. No. 107 is unlandscaped, and apparently always has been. Its location just cannot compare with the location of No. 29. An over-all evaluation of the locations and the facilities of the two schools reflect such an obvious superiority in favor of No. 29 as to be depressing. Many of the items were given to No. 29 by the P.T.A. or the public. These, say the Attorney General, should be excluded from this comparison. It is conceded that the items mentioned belong to the school and are therefore State property. My answer is that we are comparing State facilities. We cannot conjecture what the State might or might not have furnished in the absence of such items.

On the Strayer-Englehart Score Card, used by educators to evaluate the physical condition of a school plant, No. 29 far surpassed No. 107.

The teacher preparation at No. 29 is superior to that at No. 107. Also, the County Supervisor rated every teacher at No. 29 higher than either teacher at No. 107.

The experts in the field of education testitfied that the various factors mentioned are all of importance in evaluating educational opportunities. The courts have so recognized.

■ The substantial factors above mentioned, whether viewed separately or cumulatively, lead me to conclude that the facilities and educational opportunities offered at No. 29 are substantially superior to those offered at No. 107.

Another factor connected with these two schools demands separate attention, because it is a consequence of segregation so outlandish that the Attorney General, with commendable candor, has in effect refused to defend it. I refer to the fact that school bus transportation is provided those attending No. 29 who, except for color, are in the same situation as this infant plaintiff. Yet neither school bus transportation, nor its equivalent is provided this plaintiff even to attend No. 107. In fact, the State Board of Education refused to authorize the transportation of this then seven year old plaintiff to the Negro school, even though the bus for white children went right past her home, and even though the two schools are no more than a mile apart. Moreover, there is no public transportation available from or near plaintiff's home to or near the Negro school. The State Board ruled that because of the State constitutional provision for separate schools, a Negro child may not ride in a bus serving a white school. If we assume that this is so, then this practice in and of itself, is another reason why the facilities offered this plaintiff at No. 107 are inferior to those provided at No. 29. To suggest, under the facts here presented, that there are not enough Negroes to warrant the cost of a school bus for

them is only another way of saying that they are not entitled to equal services because they are Negroes. Such an excuse will not do here.

I conclude that the facilities and educational opportunities at No. 107 are substantially inferior in a constitutional sense, to those at No. 29. For the reasons stated in connection with Claymont I do not believe the relief should merely be an order to make equal.

An injunction will issue preventing the defendants and their agents from refusing these plaintiffs, and those similarly situated, admission to School No. 29 because of their color.

Orders on notice.