## DAVIS et al. v. COUNTY SCHOOL BOARD OF PRINCE EDWARD COUNTY, VA., et al.

### Civ. A. No. 1333.

United States District Court
E. D. Virginia, at Richmond.

Heard Feb. 25–29, 1952.

Decided March 7, 1952.

338

Oliver W. 'Hill, Spottswood W. Robinson, 3rd (Hill, Martin & Robinson), of Richmond, Va., and Robert L. Carter, of New York City, for plaintiffs.

T. Justin Moore, Archibald G. Robertson, and T. Justin Moore, Jr. (Hunton, Williams, Anderson, Gay & Moore), all of Richmond, Va., for defendant school board and superintendent.

J. Lindsay Almond, Jr., Atty. Gen. of Virginia, and Henry T. Wickham, Asst. Atty. Gen. of Virginia, for the Commonwealth of Virginia.

Before DOBIE, Circuit Judge, and HUTCHESON, and BRYAN, District Judges.

BRYAN, District Judge.

Prince Edward is a county of 15,000 people in the southern part of Virginia. Slightly more than one-half of its inhabitants are Negroes. They compose 59% of the county school population. At the high school plane the average pupil attendance is 386 colored, 346 white. For themselves and their classmates, a large number of these Negro students, their parents, or guardians now demand that their county school board and school superintendent refrain from further observance of the mandate of section 140 of the Constitution of Virginia and its statutory counterpart[1], the former reading: "White and colored children shall not be taught in the same school." Defendants' adherence to this command, it is averred, creates a positive discrimination against the colored child solely because of his race or color, constituting both a deprivation of his privileges and immunities as a citizen of the United States and a denial to him of the equal protection of the laws. The prohibition is denounced as a breach of the Civil Rights Act[2] and as inimical to section 1 of the 14th Amendment of the Federal constitution.

Demandants pray a declaration of the invalidity, and an injunction against the enforcement, of the separation provisions. In the alternative, they ask a decree noting and correcting certain specified inequalities between the white and colored schools. That the schools are maintained with public tax moneys, that the defendants are public officials, and that they separate the children according to race in obedience to the State law are concessa. The Commonwealth of Virginia intervenes to defend.

Plaintiffs urge upon us that Virginia's separation of the Negro youth from his white contemporary stigmatizes the former as an unwanted, that the impress is alike on the minds of the colored and the white, the parents as well as the children, and indeed of the public generally, and that the stamp is deeper and the more indelible because imposed by law. Its necessary and natural effect, they say, is to prejudice the colored child in the sight of his community, to implant unjustly in him a sense of inferiority as a human being to other human beings, and to seed his mind with hopeless frustration. They argue that in spirit and in truth the colored youth is, by the segregation law, barred from association with the white child, not the white from the colored, that actually it is ostracism for the Negro child, and that the exclusion deprives him of the equal opportunity with the Caucasian of receiving an education unmarked, an immunity and privilege protected by the statutes and constitution of the United States.

Eminent educators, anthropologists, psychologists and psychiatrists appeared for the plaintiffs, unanimously expressed dispraise of segregation in schools, and unequivocally testified the opinion that such separation distorted the child's natural attitude, throttled his mental development, especially the adolescent, and immeasurably abridged his educational opportunities. For the defendants, equally distinguished and qualified educationists and leaders in the other fields emphatically vouched the

1. Constitution of 1902; Sec. 22–221, Code of Virginia 1950, q. v., post, p. 339.

2. 8 U.S.C.A. § 41.

view that, given equivalent physical facilities, offerings and instruction, the Negro would receive in a separate school the same educational opportunity as he would obtain in the classroom and on the campus of a mixed school. Each witness offered cogent and appealing grounds for his conclusion.

On this fact issue the Court cannot say that the plaintiffs' evidence overbalances the defendants'. But on the same presentation by the plaintiffs as just recited, Federal courts [3] have rejected the proposition, in respect to elementary and junior high schools, that the required separation of the races is in law offensive to the National statutes and constitution. They have refused to decree that segregation be abolished incontinently. We accept these decisions as apt and able precedent. Indeed we might ground our conclusion on their opinions alone. But the facts proved in our case, almost without division and perhaps peculiar here, so potently demonstrate why nullification of the cited sections of the statutes and constitution of Virginia is not warranted, that they should speak our conclusion.

Regulations by the State of the education of persons within its marches is the exercise of its police power—"the power to legislate with respect to the safety, morals, health and general welfare." [4] The only discipline of this power by the 14th Amendment and the Civil Rights Acts of Congress is the requirement that the regulation be reasonable and uniform. We will measure the instant facts by that yardwand.

It indisputably appears from the evidence that the separation provision rests neither upon prejudice, nor caprice, nor upon any other measureless foundation. Rather the proof is that it declares one of the ways of life in Virginia. Separation of white and colored "children" in the public schools of Virginia has for generations been a part of the mores of her people. To have separate schools has been their use and wont.

The school laws chronicle separation as an unbroken usage in Virginia for more than eighty years. The General Assembly of Virginia in its session of 1869–70, in providing for public free schools, stipulated "that white and colored persons shall not be taught in the same school, but in separate schools, under the same general regulations as to management, usefulness and efficiency". [5] It was repeated at the session 1871–2, [6] and carried into the Code of 1873. [7] As is well known, all this legislation occurred in the period of readjustment following the Civil War when the interests of the Negro in Virginia were scrupulously guarded. The same statute was reenacted by the Legislature of 1877 [8] and again in 1878 [9], still within the Reconstruction years of Virginia. In almost the same words separation in the schools was carried into the Acts of Assembly of 1881–2 [10], and similarly embodied in the Code of 1887 [11], in the Code of 1919 [12], and now it is placed in the Code of 1950, in a single section, 22–221, in the same words: "White and colored persons shall not be taught in the same school, but shall be taught in separate schools, under the same general regulations as to management, usefulness and efficiency." The importance of the school separation clause to the people of the State is signalized by the fact that it is the only racial segregation direction contained in the constitution of Virginia.

3. Briggs v. Elliott, D.C., 98 F.Supp. 529 and Carr v. Corning, 86 U.S.App.D.C. 173, 182 F.2d 14, citing Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172, and Cumming v. County Board of Education, 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262.

4. Briggs v. Elliott, supra, D.C., 98 F. Supp. 529, 532.

5. Acts of 1869–70, c. 259, p. 402.

6. Acts of 1871–2, c. 370, p. 461.

7. Title 23, c. 78, sec. 58.

8. Acts of General Assembly 1876–7, c. 38, p. 28.

9. Acts of General Assembly 1877–8, c. 14, p. 10.

10. C. 40, pp. 36, 37.

11. Sec. 1492.

12. Sec. 719.

Maintenance of the separated systems in Virginia has not been social despotism, the testimony points out, and suggests that whatever its demerits in theory, in practice it has begotten greater opportunities for the Negro. Virginia alone employs as many Negro teachers in her public schools, according to undenied testimony, as are employed in all of the thirty-one non-segregating States. Likewise it was shown that in 29 of the even hundred counties in Virginia, the schools and facilities for the colored are equal to the white schools, in 17 more they are now superior, and upon completion of work authorized or in progress, another 5 will be superior. Of the twenty-seven cities, 5 have Negro schools and facilities equal to the white and 8 more have better Negro schools than white.

So ingrained and wrought in the texture of their life is the principle of separate schools, that the president of the University of Virginia expressed to the Court his judgment that its involuntary elimination would severely lessen the interest of the people of the State in the public schools, lessen the financial support, and so injure both races. His testimony, corroborated by others, was especially impressive because of his candid and knowledgeable discussion of the problem. A scholar and a former Governor and legislator of the State, we believe him delicately sensible of the customs, the mind, and the temper of both races in Virginia. With the whites comprising more than three-quarters of the entire population of the Commonwealth, the point he makes is a weighty practical factor to be considered in determining whether a reasonable basis has been shown to exist for the continuation of the school segregation.

In this milieu we cannot say that Virginia's separation of white and colored children in the public schools is without substance in fact or reason. We have found no hurt or harm to either race. This ends our inquiry. It is not for us to adjudge the policy as right or wrong—that, the Commonwealth of Virginia "shall determine for itself". [13]

On the second phase of this case, the inequality in the Negro schools when compared with the white, the defendants confess that the buildings and facilities furnished for Negro high school education are below those of the white school. We think the discrepancy extends further. We find inequality also in the curricula of the schools and in the provision for transportation of the students.

Undoubtedly frankness required admission by the defendants of their dereliction in furnishing an adequate school plant and facilities for the Negro. His high school is the Robert R. Moton. It is composed of one permanent brick building and three temporary, one-story, frame buildings. No gymnasiums are provided, no shower or dressing rooms to accompany physical education or athletics, no cafeteria, no teachers' rest room and no infirmary, to give some of the items absent in Moton but present in the white high school. Moton's science facilities and equipment are lacking and inadequate. No industrial art shop is provided, and in many other ways the structures and facilities do not meet the level of the white school.

In offerings we find physics, world history, Latin, advanced typing and stenography, wood, metal and machine shop work, and drawing, not offered at Moton, but given in the white schools. While the school authorities tender their willingness to give any course in the Negro school now obtainable in the white school, all courses in the latter should be made more readily available to the students of Moton.

In supplying school buses the Negro students have not been accorded their share of the newer vehicles. This practice must cease. In the allocation of new conveyances, as replacements or additional equipment, there must be no preference in favor of the white students.

■ On the issue of actual inequality our decree will declare its existence in respect to buildings, facilities, curricula and buses. We will restrain immediately its continuance in respect to the curricula and conveyances. We will order the defendant

13. Judge Parker in Briggs v. Elliott, supra, D.C., 98 F.Supp. 529, 532.

to pursue with diligence and dispatch their present program, now afoot and progressing, to replace the Moton buildings and facilities with a new building and new equipment, or otherwise remove the inequality in them.

The frame structures at Moton were erected in 1948 and 1949 as temporary expedients, upon the advice and authority of the State Board of Education. Through the activities of the school board and the division superintendent, defendants here, $840,000.00 has been obtained, the land acquired, and plans completed, for a new high school and necessary facilities for the Negroes. Both local and State authorities are moving with speed to complete the new program. An injunction could accomplish no more.

A decree will be entered in accordance with this opinion.