91 A.2d 137 (1952)
GEBHART et al.
v.
BELTON et al.
GEBHART et al.
v.
BULAH et al.
BELTON et al.
v.
GEBHART et al.
BULAH et al.
v.
GEBHART et al.
Nos. 15-18.
Supreme Court of Delaware.
August 28, 1952.
Writ of Certiorari Granted November 24, 1952.
*139 H. Albert Young, Atty. Gen., and Louis J. Finger, Deputy Atty. Gen., for appellants and cross-appellees.
Louis L. Redding, of Wilmington, and Jack Greenberg, of New York City, for appellees and cross-appellants.
SOUTHERLAND, Chief Justice, WOLCOTT, Justice, and CAREY, Judge, sitting.
Writ of Certiorari Granted November 24, 1952. See 73 S.Ct. 213.
SOUTHERLAND, Chief Justice.
Two cases, alike in respect of basic principles of law, but differing in respect of the facts, were filed in the court below by certain citizens of Negro blood, seeking the admittance of the plaintiffs[1] to public schools maintained for white pupils only. The first case, brought against the members of the State Board of Education and certain other school officials, concerns the claim of the plaintiffs, Ethel Louise Belton and others, residents in the Claymont Special School District in New Castle County and all of high school age, to be admitted to the high school maintained in that district for white pupils. The second case, brought against the members of the State Board of Education and certain other school officials, concerns the claim of the plaintiff, Shirley Barbara Bulah, a resident of Hockessin, New Castle County, to be admitted to School No. 29, an elementary school at Hockessin maintained for white pupils.
The relief sought in each case is a declaratory judgment that the provisions of the Delaware Constitution and laws requiring segregation in the public schools are in contravention of the equal protection clause of the Fourteenth Amendment to the federal Constitution, and also an injunction restraining the defendants from denying the plaintiffs admittance to the schools maintained for white pupils.
The cases were consolidated and tried before the Chancellor, who rendered a judgment denying the prayers of the complaints *140 for a declaratory judgment but enjoining the defendants from refusing the plaintiffs admittance to the schools for whites. 87 A.2d 862.
It appears from the pleadings and testimony that the following issues were made below and determined by the Chancellor and are here for review:
I. Do the provisions of the Fourteenth Amendment forbidding a state to deny to any citizen the equal protection of the laws forbid segregation of pupils in the public schools on the basis of color?
II. If state-imposed segregation is not in itself unlawful, are the educational facilities afforded by the State to the plaintiffs substantially equal to those afforded white pupils similarly situated?
Upon the authority of applicable decisions of the Supreme Court of the United States the Chancellor resolved the first question in the negative. Upon a review of the evidence pertaining to the second question he held, first, as to the plaintiffs Ethel Louise Belton and others, that the educational facilities afforded them, i.e., those of the Howard High School in the City of Wilmington, maintained for Negro pupils, are substantially inferior to those of the Claymont High School; and second, as to the plaintiff Shirley Barbara Bulah, that the educational facilities afforded her, i.e., elementary school No. 107 at Hockessin, maintained for Negro pupils, are substantially inferior to those of School No. 29.
We take up these questions in the above order.

I. Segregation per se.

Article X of the Constitution of the State of Delaware provides in part as follows:
"Section 1. The General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools, and may require by law that every child, not physically or mentally disabled, shall attend the public school, unless educated by other means.
"Section 2. In addition to the income of the investments of the Public School Fund, the General Assembly shall make provision for the annual payment of not less than one hundred thousand dollars for the benefit of the free public schools which, with the income of the investments of the Public School Fund, shall be equitably apportioned among the school districts of the State as the General Assembly shall provide; and the money so apportioned shall be used exclusively for the payment of teachers' salaries and for furnishing free text books; provided however, that in such apportionment, no distinction shall be made on account of race or color, and separate schools for white and colored children shall be maintained. All other expenses connected with the maintenance of free public schools, and all expenses connected with the erection or repair of free public school buildings shall be defrayed in such manner as shall be provided by law."
Paragraph 2631, Revised Code of Delaware 1935 provides as follows:
"Sec. 9. Shall Maintain Uniform School System; Separate Schools for White Children, Colored Children, and Moors; Elementary Schools:  The State Board of Education is authorized, empowered, directed and required to maintain a uniform, equal and effective system of public schools throughout the State, and shall cause the provisions of this Chapter, the by-laws or rules and regulations and the policies of the State Board of Education to be carried into effect. The schools provided shall be of two kinds; those for white children and those for colored children. The schools for white children shall be free for all white children between the ages of six and twenty-one years, inclusive; and the schools for colored children shall be free to all colored children between the ages of six and twenty-one years, inclusive. The schools for white children shall be numbered and the schools for colored children shall be numbered as numbered prior to the year 1919. The State Board of Education shall establish schools for children of people called Moors or Indians, and if any Moor or Indian school is in existence or shall *141 be hereafter established, the State Board of Education shall pay the salary of any teacher or teachers thereof, provided that the school is open for school sessions during the minimum number of days required by law for school attendance and provided further that such school shall be free to all children of the people called Moors, or the people called Indians, between the ages of six and twenty-one years. No white or colored child shall be permitted to attend such a school without the permission of the State Board of Education. The public schools of the State shall include elementary schools which shall be of such number of grades at the State Board of Education shall decide after consultation with the Trustees of the District in which the school is situated."
Do these provisions, in so far as they require segregation in the public schools based on race or color, offend against the provisions of the Fourteenth Amendment to the Constitution of the United States, forbidding any state to deny to any citizen the equal protection of the laws?
The leading case in the Supreme Court of the United States approving the right of a state to establish separate school systems for whites and Negroes is Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256. That case involved directly only segregation required by Louisiana law in railway passenger coaches. Mr. Justice Brown, however, supported his conclusion that the statute before the court was constitutional by pointing to state statutes establishing separate schools as affording a "common instance" of the validity of segregation laws, and observed that such statutes for separate schools had "been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced." 16 S.Ct. 1140. Even if this holding could be deemed dictum, the subsequent case of Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 93, 72 L.Ed. 172, admits of no such distinction. In that case a citizen of Chinese ancestry was denied admission to a state school maintained for white pupils because she was of the "yellow race" and was deemed to be "colored". Stating the question presented to be whether a Chinese citizen is denied equal protection of the laws when he is classed among the colored races and furnished facilities for education equal to that offered to all, Chief Justice Taft said:
"Were this a new question, it would call for very full argument and consideration; but we think that it is the same question which has been many times decided to be within the constitutional power of the state Legislature to settle, without intervention of the federal courts under the federal Constitution."
After citing numerous state decisions upholding segregation in the public schools, the Chief Justice quoted with approval the language of Mr. Justice Brown in Plessy v. Ferguson, supra, dealing with that subject, and concluded:
"Most of the cases cited arose, it is true, over the establishment of separate schools as between white pupils and black pupils; but we cannot think that the question is any different, or that any different result can be reached, assuming the cases above cited to be rightly decided, where the issue is as between white pupils and the pupils of the yellow races. The decision is within the discretion of the state in regulating its public schools, and does not conflict with the Fourteenth Amendment."
These cases, we think, are decisive of the question. Moreover, in the recent decisions of Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114, and McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149, the Supreme Court of the United States has refused to overrule Plessy v. Ferguson, though expressly urged to do so.[2] It is nevertheless argued that the cases of Plessy v. Ferguson and Gong Lum v. Rice, supra, are without force today and that we should assume that they will be overruled. We can make no such assumption. "It is for the *142 Supreme Court, not us, to overrule its decisions or to hold them outmoded." Boyer v. Garrett, 4 Cir., 183 F.2d 582, per curiam. It is our duty to uphold the Constitution of our State, and not to abrogate its provisions except in so far  and only in so far  as required to do so by a ruling of the Supreme Court of the United States that they infringe upon rights protected by the federal Constitution. We must hold that segregation in the state's public schools is not illegal per se.
Our conclusion is supported by the following decisions of the federal courts, all rendered within the past three years: Corbin v. County School Board, 4 Cir., 177 F. 2d 924; Carr v. Corning, 86 U.S.App.D.C. 173, 182 F.2d 14; Boyer v. Garrett, 4 Cir., 183 F.2d 582; Briggs v. Elliott, D.C., 98 F. Supp. 529; Brown v. Board of Education of Topeka, D.C., 98 F.Supp. 797; and Davis v. County School Board, D.C., 103 F. Supp. 337. A recent holding of the Supreme Court of Missouri is to the same effect. State ex rel. Toliver v. Board of Education, 360 Mo. 671, 230 S.W.2d 724.
A detailed review of these cases is unnecessary, since we are cited to no case holding to the contrary. They establish the principle that the constitutional guarantee of equal protection of the laws does not prevent the establishment by the state of separate schools for whites and Negroes, provided that the facilities afforded by the state to the one class are substantially equal to those afforded to the other (often referred to as the "separate-but-equal" doctrine). The question of segregation in the schools, under these authorities, is one of policy, and it is for the people of our state, through their duly chosen representatives, to determine what that policy shall be. When so determined, it must be given effect by our courts, subject always to the rule enjoined both by the Constitution of the United States and our own statute, that substantially equal treatment must be accorded. State ex rel. Toliver v. Board of Education, supra.
The refusal of the Chancellor to enter the declaratory judgment prayed for was therefore, in our opinion, correct.
But it is said that the uncontradicted evidence adduced by the plaintiffs shows that state-imposed segregation in the public schools and equality of educational opportunity are inherently incompatible, and that the Chancellor so held. The Chancellor indeed found on the evidence that segregation itself results in the Negro's receiving inferior educational opportunities, and expressed the opinion that the "separate-but-equal" doctrine should be rejected. He nevertheless recognized that his finding was immaterial to the legal conclusion drawn from the authorities above cited. We agree that it is immaterial, and hence see no occasion to review it. The Supreme Court of the United States has said that the states may establish separate schools if the facilities furnished are substantially equal for all. To say the facilities can never be equal is simply to render the Court's holdings meaningless  in effect, to say that that Court's construction of the Constitution is wrong. If so, it is for that Court to say so and not for us.
On the issue of segregation per se, we affirm the Chancellor's legal conclusion that it does not contravene the Fourteenth Amendment.

II. Substantial equality or inequality of educational facilities.

We turn to the second branch of the controversy. It is subdivided into two parts, the first concerning the claim that the facilities of Howard High School are substantially inferior to those of Claymont High School, and the second concerning the claim that the facilities of School No. 107 are substantially inferior to those of School No. 29.
Preliminarily it is to be observed that the facts in both cases, though developed largely from oral testimony, are almost wholly undisputed. The areas of disagreement concern the inferences of equality or inequality of facilities to be drawn from undisputed facts; hence, the rule requiring affirmance of the Chancellor's findings upon disputed issues of fact, if there be supporting evidence, has little application to this case. The holding in the case of Blish v. Thompson Automatic Arms Corporation, 30 Del.Ch. 538, 584, 64 A.2d 581, 604, cited *143 to us by plaintiffs, and our recent holding in Pierce v. Wahl, Del., 86 A.2d 757, concern findings upon sharply disputed issues of fact. We think it our duty to review the evidence and draw our own conclusions.
Before proceeding to an analysis of the evidence touching the comparison of the educational facilities of one school with another, we inquire whether there are any principles or standards evolved by the courts to determine what constitutes "substantial equality". As the Chancellor indicated, it is not difficult to state the rule but it is quite difficult to apply it. Identity or absolute equality in all respects is, as observed by Judge Dobie, "impractical and somewhat Utopian". Corbin v. County School Board, supra [177 F.2d 928]. Yet substantial equality in the essential and the more important aspects of educational opportunity there must be if segregation is to be upheld. There is thus imposed upon the courts the difficult and delicate task of drawing the line between the unimportant and incidental differences inevitably occurring in any comparison of two schools, whether for whites or Negroes, and a substantial disparity placing the plaintiff at a material disadvantage because of his race or color. We must avoid the tendency, natural enough in these circumstances, to magnify minor variations, and at the same time we must be vigilant to strike down unhesitatingly any instance of discriminatory treatment.
From the recent cases which have dealt with the question of "substantial equality" we extract the following general principles:
The right to equal opportunity is a personal one. State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208. Rights under the equal protection clause are "personal and present". The state must provide education for the applicant "and provide it as soon as it does for applicants of any other group". Sipuel v. Board of Regents of University, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; quoted and reaffirmed in Sweatt v. Painter, supra.
Since the right to equal opportunity is a personal one, it cannot be denied because of limited demand, nor depend on the number of applicants. State of Missouri ex rel. Gaines v. Canada, supra.
The opportunities afforded, as between white and Negro schools, need not necessarily exist in the same place or school district; the state may choose the place. Gong Lum v. Rice, supra; Winborne v. Taylor, 4 Cir., 195 F.2d 649; Trustees, Pleasant Grove Independent School District v. Bagsby, Tex.Civ.App., 237 S.W.2d 750; Pearson v. Murray, 169 Md. 478, 182 A. 590, 103 A.L.R. 706.
Differences in travel, as between white and Negro pupils, do not necessarily show substantial inequality, particularly if the state furnishes transportation. Winborne v. Taylor, supra. But travel, coupled with inadequate transportation, may become sufficiently burdensome to constitute a substantial inequality. Corbin v. County School Board, supra.
The cases also disclose that in determining whether substantial equality or inequality exists, the usual approach is to determine whether, upon a comparison of the two schools concerned, the facilities of one are, upon over-all examination, so manifestly inferior to those of the other that the plaintiff necessarily suffers injury. See, for example, Parker v. University of Delaware, Del.Ch., 75 A.2d 225; Corbin v. County School Board, supra. Even in the absence of general inferiority, however, if it appears that the plaintiff, by reason of his race or color, is denied some one course of high school instruction indispensable to his education and available to others, substantial inequality exists as to him. State ex rel. Brewton v. Board of Education, 361 Mo. 86, 233 S.W.2d 697. And conversely, if the facilities are otherwise substantially equal, plaintiff is not injured because some courses offered in the white school are not offered in the Negro school if it appears that he is receiving substantially equal instruction in all the courses he desires to take. Brown v. Ramsey, 8 Cir., 185 F.2d 225.
A further question must be asked: What if some of the facilities at school A are superior to similar facilities at school B, and other facilities at school B are superior to similar ones at school A? Which *144 school is to be deemed the better? As will hereafter appear, the question is pertinent to one of the cases before us. We agree with the Chancellor that the comparison cannot be made by attempting to offset an advantage of one kind against a disadvantage of another kind. "Equivalency cannot be determined by weighing the respective advantages furnished to the two groups". Carter v. School Board of Arlington County, 4 Cir., 182 F.2d 531, 535. The Chancellor met this difficulty, however, by holding, as a matter of law, that if the facilities or educational opportunities available to the Negro are, as to any substantial factor, inferior to those available to white children similarly situated, the constitutional principle of "separate but equal" is violated. This conclusion, he held, followed from the consideration that a court could not say that such a substantial factor would not adversely affect the educational progress "of at least some of those concerned". 87 A.2d 868. But this is in effect to say that even if the plaintiff be not injured by the inequality, there are probably others who are now or who may hereafter be injured by it; and hence substantial inequality must be found in any such case. Upon the basis of the legal principles we have stated, particularly the principle that the right to the equal protection of the laws is a personal and present one, we think the rule announced by the Chancellor too sweeping and must disapprove it in so far as it purports to lay down a rule of universal application. We think that in a case where substantial inequality exists only in a few of the many factors entering into the comparison, the inquiry must be, Is the plaintiff injured by those inequalities? If he is not, he may not have relief. Cf. McCabe v. Atchison, T. & S. F. R. Co., 235 U.S. 151, 35 S.Ct. 69, 71, 59 L.Ed. 169, involving a class suit to enjoin the enforcement of an Oklahoma statute requiring segregation in railway passenger coaches. The bill was dismissed by the trial court, and its decision was affirmed by the Supreme Court of the United States, Justice Hughes saying: "The complainant cannot succeed because someone else may be hurt." But if such substantial inequalities do injure the plaintiff, then he is entitled to relief. These conclusions follow, we think, from the principles we have above derived from the applicable decisions.
With these general observations in mind, we turn to a review of the evidence.

First. Howard High School and Claymont High School.
Ethel Louise Belton, as well as the other plaintiffs in this case, pupils of high school age, made application to enter the Claymont High School and were refused admittance as pupils solely on account of race or color. The plaintiff, Ethel Louise Belton, was at the time of trial fifteen years of age, and was attending Howard High School in the tenth grade, the lowest grade of the senior high school. She and all the other plaintiffs are residents of the Claymont Special School District in New Castle County, in which a public school with grades 1 to 12 (both elementary and secondary grades) is maintained for white pupils by the school authorities of the State and of the special school district. Howard High School is a public school with grades 7 to 12 (junior and senior high schools only), maintained for Negro pupils by the Board of Education of the City of Wilmington, with some supervision by the State Board of Education and substantial financial support from the State. It is the only public school in New Castle County offering a complete high school course to Negroes. The Claymont School is distant from plaintiff Belton's home about a mile and a half; the Howard School in Wilmington, about nine miles. The State provides no transportation from Claymont to Wilmington.
Under the administration of Howard High School is the Carver building in which certain vocational courses are given. Plaintiff Belton takes certain academic courses at the Howard building. On two days of the week, at about three o'clock in the afternoon, she leaves that building and walks to the Carver building, a distance of about nine city blocks, to take courses in shorthand and typewriting, which are given between the hours of three-thirty and five-thirty.
No other plaintiff testified, and the record fails to show whether any of them takes or expects to take any of the vocational courses given in the Carver building, nor, *145 if so, whether he is or would be required to take it after three o'clock in the afternoon.
Plaintiffs assert that the educational facilities and opportunities afforded them at Howard High School are substantially inferior in many respects to those offered at the Claymont School to white pupils similarly situated.
The following is a summary of the evidence relating to the facilities of the two schools:

(1) Public Funds.

No contention is made of any inequality of financial treatment. It affirmatively appears that Howard receives the same treatment as the other Wilmington high schools and (so far as comparison can be made) the same treatment as Claymont.

(2) Buildings.

The Howard building proper and the Claymont building are admittedly equal, except that the Howard gymnasium is insufficient for physical education, and some instruction must be given in the Walnut Y.M.C.A. gymnasium, distant three and one-half blocks from Howard. The Carver building is a very old one and markedly inferior. We approve the Chancellor's finding, not seriously challenged by the defendants, that the physical plant at Howard-Carver is substantially inferior to that at Claymont.

(3) Sites.

Claymont, in a suburban community, is on a site of fourteen acres; the Howard building proper, in an urban community, on a site of three and one-half acres. The Carver building is on a plot with about forty feet of land on either side of the building and no land in front or play space in the rear. There is testimony, not denied, that the space at Carver is inadequate as a playground for pupils in that building.
As between Claymont and Howard proper, the Claymont playing space is larger and includes regulation athletic fields, but Howard has the use, exclusive when required, of Kirkwood Park, a public park of ten and one-half acres adjacent to the site of the Howard building, which has, however, no regulation playing fields. As for organized athletics, Howard, like the Wilmington High School, has the use of the athletic fields of the P. S. duPont High School and the George Gray School, each at least half a mile distant from the Howard building.
So far as concerns physical education there is no testimony in the record that the playground space available to Howard-Carver is inadequate for that purpose. The inadequacy of Howard-Carver in respect of physical education appears to be attributable to the insufficiency of the gymnasium, above noted.
In respect of esthetic considerations, the Claymont site is admitted to be superior.
The defendants argue that, disregarding Carver, the difference in sites as between Claymont and Howard lies in esthetic considerations only and that this difference is not in itself a substantial inequality. We are inclined to agree that if these two schools were substantially equal in all other respects such a difference would hardly justify a finding of substantial inequality; but in this case esthetic considerations do not stand alone. All other considerations apart, the playground space of Carver is concededly inadequate. The Chancellor also found that the playing space available to Howard proper as well as at Carver is inadequate; but this finding appears to rest solely on the lack of regulation fields in Kirkwood Park, and we do not think that the evidence justifies a finding that any of the plaintiffs has suffered injury from this lack. However, for the purpose of the trial and decision of the case below Howard-Carver was treated as a unit, and on this basis the finding of substantial inequality in respect of the sites is justified.
In this connection we add an observation in connection with the Chancellor's comments with respect to the relative advantages and disadvantages of urban and suburban schools. In our opinion substantial inequality between two schools does not result from the mere fact that one is in the suburbs and another in the city. The question is always whether there are differences between the schools of such a nature as to make them substantially unequal. *146 Indeed the policy of consolidation of schools, apparently proceeding at an increasing rate, necessarily requires more and more pupils to attend a school situated in a community of a different type from that in which they live. It may reasonably be inferred that in the opinion of authorities on education school attendance in one's own community is not an important attribute of educational opportunity.

(4) Accreditation.

Both schools are approved by the Association of Colleges and Secondary Schools of the Middle States and Maryland.

(5) Curriculum.

Plaintiffs adduced testimony from an expert witness, who made a survey of both schools, to the effect that the Claymont curriculum in respect of college preparatory work was superior to that of Howard, seven courses, it was stated, being offered at Claymont that are not offered at Howard. It was established that one of these courses is no longer offered at Claymont, that four others (or their equivalents) are in fact offered at Howard, and that the other two are of minor importance. It is admitted that seven vocational courses are offered at Howard that are not offered at Claymont. There is no evidence that any of the plaintiffs is denied any course of instruction that he seeks. The Chancellor made no finding of inequality in respect of the curriculum, and we think he was right. The evidence shows that they are substantially equal.

(6) Faculty and Instruction.

Claymont has 404 high school pupils with 20 teachers, a pupil-teacher ratio of 20.1. Howard has 1274 pupils with 53 teachers, a ratio of 24. Of the teachers at Claymont, 59% hold master's degrees, and 36% bachelor's degrees. Of the teachers at Howard, 38% hold master's degrees and 49% bachelor's degrees. One teacher at Claymont holds no degree and five teachers at Howard (three of them vocational) hold no degree. The average annual salary at Howard is higher than that at Claymont by $169. We find no evidence in the record of the length of experience of the teachers of either school. The methods of instruction are modern in both schools.
A comparison of the size of the classes in eight different subjects shows that at Howard classes in five of these subjects were larger, though not substantially larger[3], than at Claymont, and in two subjects the Howard classes are slightly smaller. In one subject, Physical Education, the disparity is substantial, the average class at Claymont being 24.88 and at Howard 43.67, with some classes so large (one with an enrollment of 88) as probably to prevent satisfactory instruction.
Viewing the situation as a whole, we think that plaintiffs have clearly shown substantial inequality in one respect, that of instruction in Physical Education, which (we infer from the record) is a required course at Howard for all pupils except for those excused for cause. It is evidently related to the inadequacy of the Howard gymnasium, already noted. We cannot agree with the Chancellor, however, that the other differences (pupil-teacher ratio, formal teacher training, and average size of classes) represent substantial inequality. They seem to us to be such differences as might be found between any two high schools, whether for whites or Negroes. As against the differences in the formal training of teachers, it is to be noted that the testimony from both sides indicates that it is still not unusual for vocational teachers to lack academic degrees, and that the larger number of such teachers at Howard appears fairly attributable to the emphasis in Howard on vocational training. It further appears that the general policies of the Wilmington Board of Education, which include a policy to avoid as far as possible the employment of teachers without academic degrees, have been as nearly accomplished in Howard as in any other public school in Wilmington. As for the average size of the classes, it appears that the Chancellor's finding of substantial inequality was based in great part upon the fact that several classes at Howard exceeded twenty-five in number, and upon his conclusion *147 that a pupil-teacher ratio of twenty-five to one "has been fixed by the State educational authorities as a desirable maximum". This conclusion does not appear to be supported by the record. It is clear to us, from the testimony of the Director of Research of the State Board of Education and of the Assistant State Superintendent in charge of secondary schools, that the ratio derives directly from the legislative policy establishing the method of allotting state funds for the employment of teachers, and bears no necessary relation to the size of any particular class.[4] Moreover, since principals and specialists are included in the determination of the ratio for the allotment of funds, the actual ratio of pupils to teachers usually exceeds the ratio for fund allotments. A tendency to smaller classes is said to be desirable, but we do not find any formal fixation by the State authorities of a desirable maximum size. In short, we do not think the evidence on these matters discloses anything more than such variations as are inevitable concomitants of the administration of any school system.

(7) Equipment and Instructional Materials.

These are conceded to be equal.

(8) Libraries.

These are conceded to be equal. As is to be expected, the Howard Library is the larger.

(9) Physical and Mental Health and Nursing Services.

The Howard health services are admittedly superior and the Chancellor so found. An attempt was made to show that the nursing services at Claymont were superior, but this contention appears to be abandoned.

(10) Extra-curricular Activities.

It was testified that Claymont has seven extra-curricular activities (clubs of various kinds) and Howard only three. In addition to these clubs, however, individual students at Howard, selected by their classmates, participate in the Wilmington program of radio activities. The inclusion of the "Drivers Club" as one of the seven is a manifest error since Howard, like all high schools in the state, has a drivers' class.[5] It is a fair conclusion from the evidence that the organization of student clubs depends in large part upon individual interest. Differences in number and kind of extra-curricular activities thus reflect differences in interests and tastes and not inadequacy of facilities. We think these differences too insubstantial to support a finding of inequality.

(11) Travel.

As above stated, plaintiff Ethel Louise Belton is required to travel to Wilmington every morning on a public bus, and then, on two afternoons of the week, to walk nine blocks to the Carver building, which she leaves at five-thirty o'clock. She is within walking distance of the Claymont School, and it appears that the courses she takes at Carver are given at Claymont during the regular school day and before three o'clock in the afternoon. Moreover, high school pupils at Claymont who live farther than two miles from the school are furnished transportation in the school buses provided by the State school authorities. No transportation is furnished to the plaintiff. These facts, we think, constitute clear evidence of substantial inequality and unlawful discrimination on account of race or color. We approve the Chancellor's ultimate finding on this point. We should add, however, that we do not *148 agree that the question of travel, as a factor in determining substantial equality, is to be resolved on the basis of comparitive distance alone. There are other pertinent aspects of the question. The present trend toward consolidation of the public schools, mentioned above, inevitably entails many miles of travel for many pupils, white as well as Negro, particularly for those in the high schools. Thus this consequence does not flow from discrimination an account of race or color but from the general state policy with respect to the consolidation and location of schools  a policy with which the courts have nothing to do. The recent decision of the Fourth Circuit Court of Appeals in Winborne v. Taylor, supra. supports this view. That case involved a consolidation of three Negro high schools in the towns of Plymouth, Roper and Creswell into one improved school at Roper to be equal in all respects (in fact superior) to the schools for whites. This consolidation required the Negro pupils at Plymouth to travel eight miles, and those at Creswell sixteen. The sole question before the court was whether the travel distance was so unreasonably burdensome as to justify a finding of substantial inequality. The court below found such travel to be a normal and usual incident of the school system and not unreasonably burdensome. The Court of Appeals affirmed [195 F.2d 651], observing that "[t]he drawing of fine lines and minute differences, in the face of manifest substantial equality, is a burden neither the law requires nor reason suggests." To the same effect is Brown v. Board of Education of Topeka, D.C., 98 F.Supp. 797.[6] As we have above stated, educational facilities need not be furnished in the same place or in the same school district. See the authorities cited supra.
We are accordingly unwilling to assent to the plaintiffs' argument that the travel distance here involved is in itself a substantial inequality. All the facts must be considered. But in the circumstances of this case, i. e., the extra travel to Carver and the failure of the State to supply transportation, such a finding must be made.
We have reviewed in detail the facts bearing upon the comparative educational facilities afforded by the two schools. We have found that the physical plant of Howard-Carver, including the sites, is substantially unequal to that of Claymont; that the classes in physical education at Howard are so large as probably to jeopardize satisfactory education; and that the plaintiff Belton is subjected to unequal and discriminatory treatment in respect of travel.
We think that these findings compel the conclusion that the plaintiff Belton is not afforded educational facilities substantially equal to those afforded white pupils at Claymont, and has suffered injury therefrom. In respect of the differences in facilities for and instruction in physical education, and in respect of transportation from Claymont to Wilmington, the other plaintiffs have also been injured. These inequalities are not incidental or unimportant differences, and it is our clear duty to say that they constitute unlawful discrimination on account of race or color. We so find, and the plaintiffs' suit must prevail.
Relief. There remains the question of the relief to be given. Both in the court below and here defendants press the argument that even if the finding of inequality was correct, the form of the decree, in effect directing the school authorities to admit plaintiffs to the Claymont School, was erroneous. The judgment, it is said, should have taken the form of a judgment directing the defendants to equalize the facilities and affording them a reasonable time within which to do so. In support of this contention, the Attorney General cites the cases of Briggs v. Elliott, supra, and Davis v. County School Board, supra, both of which are decisions of three-judge courts in federal districts in South Carolina and Virginia, respectively.
In the Briggs case, the court declared the facilities of the Negro schools unequal and directed the defendants to equalize the facilities promptly and to submit within six months a report showing the action taken. Plaintiffs appealed and the Supreme Court vacated the judgment and remanded the *149 case to the District Court to permit it to consider the report and to take whatever action thereon it might deem appropriate. 342 U.S. 350, 72 S.Ct. 327, 328. Upon the filing of the report, the District Court found that the action taken by defendants would result in the equalization of facilities by the opening of the next school year and again entered a judgment directing equalization of facilities. D.C., 103 F.Supp. 920. Plaintiffs have again appealed to the Supreme Court of the United States and probable jurisdiction has been noted. 72 S.Ct. 1078.
In the Davis case, the court enjoined the continuance of certain inequalities that it found to exist, and as to others directed the school authorities to pursue with diligence their program to replace the inadequate facilities with new ones or otherwise remove the inequalities.
Urging that, if inequality be found in this case, an order directing the defendants to equalize facilities will afford the plaintiffs adequate relief, the Attorney General shows that there is now under way in the City of Wilmington a far-reaching program for the betterment of facilities in the Negro schools. As to the Howard-Carver buildings, plans have been approved for the transfer of the junior high school pupils at Howard to another junior high school, for the enlargement of the Howard building, with additional equipment, and for the closing of Carver and the transfer of its pupils to Howard. It is said that all these changes are expected to be completed by September, 1953, and that they will completely equalize the Howard facilities. It is also shown that plans are under way to build a modern high school for Negroes at Middletown, New Castle County. Hence the defendants say that a decree to equalize the facilities will afford plaintiffs adequate relief.
There are two preliminary difficulties with the defendants' position. First, the Board of Education of the City of Wilmington, which has direct supervision of the Wilmington schools, is not a party to the cause; second, it is difficult to see how a court of equity could effectively supervise and direct the expenditure of state funds in a matter committed to the sound administrative discretion of the school authorities. But we prefer to rest our decision upon another ground. With deference to the decisions in the Briggs and Davis cases, which we have carefully examined and considered, we cannot reconcile the denial of prompt relief with the pronouncements of the Supreme Court of the United States. If, as we have seen, the right to equal protection of the laws is a "personal and present" one, how can these plaintiffs be denied such relief as is now available? The commendable effort of the State to remedy the situation serves to emphasize the importance of the present inequalities. To require the plaintiffs to wait another year under present conditions would be in effect partially to deny them that to which we have held they are entitled. It is possible that a case might occur in which completion of equalization of facilities might be so imminent as to justify a different result, but we do not pass on that question because it is not presented. We think that the injunction of the court below, in effect commanding the defendants to admit the plaintiffs to the Claymont school, was rightly awarded.

Second. Hockessin School No. 29 and Hockessin School No. 107.
We take up the second case, involving the claim of the plaintiff Shirley Barbara Bulah to be admitted to Hockessin School No. 29.
The plaintiff, a Negro child eight years of age, is a resident of the village of Hockessin, New Castle County. At or near Hockessin the State Board of Education maintains two elementary schools with grades one to six, School No. 29 for white children and School No. 107 for Negro children. School No. 29 is a four-room school with four teachers and 111 pupils. School No. 107 is a two-room school with two teachers and 44 pupils. The school districts have separate boards of trustees, but are, we understand, largely overlapping in area though the boundaries are not identical. Plaintiff lives at a distance of two miles from School No. 107. No transportation is furnished by the State for pupils in School 107. The State provides a school bus for pupils in School 29, which passes *150 by plaintiff's house. In September, 1950, application was made on plaintiff's behalf for transportation to School 107 in the school bus serving School No. 29, and the request was refused. The present suit raises the general question of inequality of educational facilities furnished at School 107.
The following is a review of the pertinent evidence relating to a comparison of the two schools:

(1) Public Funds.

It is admitted that until recently School No. 29 was favored in the allocation of public funds. For the year 1949-1950 it was given $178.13 per pupil; No. 107 only $137.22 per pupil. This inequality has since been remedied and School No. 107 now receives equal or greater support, but the prior inequality is of importance, as will be seen.

(2) Buildings and Sites.

Both buildings are of brick, that of No. 29 on a site of five acres and that of 107 on a site of two acres. School No. 29 was built in 1932 at a cost of $55,438; No. 107, in 1921 at a cost of $21,382. No. 107 was until 1949 an oversized one-room school. In that year, its enrollment having reached 46, it was converted into a two-room school by installing a temporary movable partition through the middle of the room. According to the insurance records in the office of Business Administration of the State Board of Education, the present value of the building and equipment of No. 29 is $77,107; that of No. 107, $13,100. There was testimony on behalf of plaintiff that the appreciation of one and the depreciation of the other must reflect differences in maintenance upkeep and improvements. The inference is certainly not unreasonable. Some corroboration of this testimony is to be found in the record. Discrimination in the appropriation of public funds has already been noted. A comparative survey in 1951 of the equipment of the two schools shows the exterior painting and the floors to be in good condition in No. 29, but in poor condition in No. 107. The toilet facilities at No. 29 are substantially superior to those at No. 107. The fire hazard at No. 107 appears to be greater. No. 29 has an auditorium and a basement; No. 107, neither. These differences just mentioned may be attributable to the fact that one building is a four-room school and the other a two-room school; but, as hereafter pointed out, the State makes no point of this fact. Plaintiff further contended that the custodial service at No. 107 was inadequate.
Now it is to be noted that, although the plaintiff's evidence on the matter of the physical deficiencies in the building of School 107 rests in part on inference, and is lacking in many details, the defendants made no real effort to meet it. The State produced the school official who made the survey referred to, but he gave no evidence contradicting the testimony of plaintiff's witness either as to the past and present valuations of the school plants or as to the inference of disparity in maintenance, upkeep and improvements. There is testimony that the State in recent years has spent or allotted funds for School 107, in excess of those budgeted, for "delayed repairs". This fact would indicate an attempt to improve the condition of the building of No. 107, but the State proffered no testimony that such expenditures had been made or had substantially equalized the condition of the physical plants of the two schools, or would equalize them in the near future. Knowledge of the facts must certainly be attributed to the defendants, and this failure to adduce them, or to show that disparities in the physical plant would be promptly remedied, is significant.
Plaintiff's expert witness testified that he had made a comparison of the physical plants and equipment of the two schools by using the "Strayer-Englehart" score card.[7] Of a maximum possible rating of 644 *151 points, School 29 was given 594 points; School 107, 281 points. No doubt this evaluation included some items of relatively minor importance, but the over-all disparity is great. Again, the defendants failed to challenge this testimony in any effective way. The card does not appear to have been put in evidence nor was the weight accorded the various items upon it developed by cross-examination or otherwise. An attempt was made to prove that the Strayer-Englehart card is obsolete, but it was shown without contradiction that it was used recently in a survey of the District of Columbia schools made under Congressional authority. At all events, it embodied a comparison of the two schools by an experienced educator, and no such comparison was offered by the State.
As for the sites, that of No. 29 is conceded to be superior, but the defendants say that this superiority consists largely in the landscaping which is attributable, it is said, to the voluntary efforts of the parent-teachers association of School 29. The record on this point is not wholly clear. Defendants' list of items given by the P. T. A. refers to "large shrubbery and trees". Plaintiff urges that the State owns and maintains them, and that the source of its title is legally immaterial. We think it unnecessary to resolve this question. Taking the physical plants as a whole, No. 29 appears to be substantially superior and defendants failed to meet in any satisfactory way the plaintiff's case on this point. True, the defendants' witness who made the comparative survey above mentioned testified that the facilities of School 107 "are certainly equal to and better than the majority of two-teacher schools [in the State], both white and colored." This testimony was not controverted, but it does not reach the point. The case was tried by both sides upon the theory that School No. 29, a four-room school, was to be compared with School No. 107, a two-room school. Whether this theory is legally correct, or whether the comparison should have been between two schools of comparable size, or upon some other basis, we may not consider. The question is not before us. It was suggested by the Chancellor in a colloquy with counsel, but it was not followed up by the defendants. They accepted the plaintiff's tendered basis of comparison, and it cannot be changed here. Indeed the defendants do not suggest that it should be changed.
One other circumstance should be noted. The Chancellor himself inspected the two school buildings, and evidently based his finding of substantial inequality partly upon his own observation. To his conclusion from his own inspection we must give due weight.
We find that the physical plant of No. 29 is substantially superior to that of No. 107.

(3) Equipment.

There appears no substantial inequality in physical and instructional equipment, including the libraries, with the exception of medical supplies and equipment, which appear to be superior at No. 29. Some attempt was made to show inequality of instructional materials but the Chancellor made no finding of inequality on this point, and we think none is justified.

(4) Teachers.

The testimony shows that teachers at School No. 29 possess a superiority in formal training and are rated somewhat higher than the teachers at School No. 107. If these facts stood alone we should have difficulty in concluding that they represent anything more than accidental differences. However, they are to be viewed in the light of the admitted discrimination against School 107 in respect of the allotment of State funds. As above stated funds appropriated for the years prior to the year 1951-1952 were unequally allotted, to the detriment of School 107, and this inequality extended to teachers' salaries.[8] This *152 was a direct violation of our constitutional and statutory provisions, above quoted, requiring that in the apportionment of funds for the support of the public schools no distinction shall be made on account of race or color. Beginning with the fiscal year of 1951-1952 this inequality has been remedied. The plaintiff's testimony, however, related to conditions at School No. 107 in October, 1951, and thus tended to show that the effect of the prior wrongful apportionment of funds still persisted. The burden was clearly upon the defendants to show the extent to which the remedial legislation had improved conditions or would improve them in the near future. This the defendants failed to do. It is natural to suppose that with the equality of funds any substantial disparities will shortly be eliminated, but we must take the record as it was made below, and it affords some support for plaintiff's general contention of substantial inequality. In view of our other findings in the case it is unnecessary to evaluate the weight to be given to this factor.

(5) Transportation.

The facts with respect to this point have been stated. It admits of no doubt that the refusal of the defendants to furnish transportation to plaintiff, while furnishing it to pupils at School No. 29, constitutes substantial inequality of treatment because of race or color. The fact that there are insufficient Negro pupils to meet the requirements of defendants' rules for the establishment of a separate bus is legally irrelevant. State of Missouri ex rel. Gaines v. Canada, supra; Brown v. Ramsey, supra.
The above review of the evidence leads us to the conclusion that plaintiff has established, by a preponderance of the evidence, her contention that the facilities of School No. 107 are, to the extent set forth, substantially unequal to those at School No. 29, and that she has suffered injury.
We have already discussed, in the Howard-Claymont case, the matter of relief. It accordingly follows that the Chancellor's order in respect of the admittance of the plaintiff Bulah to School No. 29 must be affirmed.
In affirming the Chancellor's order we have not overlooked the fact that the defendants may at some future date apply for a modification of the order if, in their judgment, the inequalities as between the Howard and Claymont schools or as between School No. 29 and School No. 107 have then been removed. As to Howard, the defendants, as above stated, assert that when the Howard-Carver changes are completed, equality will exist. The Chancellor apparently thought the contrary. We do not concur in his conclusion, since we think that that question, if it arises, is one which will have to be decided in the light of the facts then existing and applicable principles of law. The Chancellor properly reserved jurisdiction of the cause to grant such further and additional relief as might appear appropriate in the future, and we construe this reservation to be a general reservation to any party to the cause to make an application to modify the order in any respect if and when changed conditions are believed to warrant such action.
We also note, with respect to both of the cases, that each cause is a so-called "spurious class suit" brought for the benefit of plaintiffs "and others similarly situated". We express no opinion whether, as to those "similarly situated" other than the plaintiffs, the judgment is res judicata or whether it has force only under the rule of stare decisis. Cf. 3 Moore's Federal Practice, § 23.11(3). That question is not before us.
In conclusion, we add one further observation applicable to both cases, that is, that there are some points of comparison of the schools developed in the evidence and discussed on the briefs that, for the sake of brevity, have not been specifically mentioned. For the benefit of counsel, we may say that we have not overlooked them, but have regarded them either as of minor importance or as cumulative only.
The judgment of the Court of Chancery is affirmed.
NOTES
[1] "Plaintiffs" in this opinion refers to the infant plaintiffs.
[2] See Education, Segregation and the Supreme Court, 99 Pa.L.Rev. 949.
[3] The average differences, expressed arithmetically, range from 2.65 to 8.51.
[4] The Act of June 30, 1949, 47 Laws of Del.Ch. 364, provides that no state funds (as distinct from funds raised locally) shall be appropriated for teachers' salaries to any school district in excess of one teacher for each unit. A unit is, in grades one to six, twenty-five pupils or major fraction thereof, and, in grades seven to twelve, twenty pupils or major fraction thereof. In the case of a twelve-grade school, the teachers may be divided between the elementary and secondary schools in any way desired. It is clear that reasonable variations in the size of classes are to be expected in all schools, both white and Negro.
[5] See 1951 Report of the State Superintendent of Public Instruction, p. 119.
[6] On appeal to the Supreme Court of the United States, probable jurisdiction noted, 72 S.Ct. 1070.
[7] "This score card is used by a person, a qualified person, making a survey of the school in checking and giving certain weights to the items that are listed on the score card. Those items in general cover site, building  when I say `building' I am referring to classrooms, general service rooms, internal structure, service systems, fire protection system, cleaning systems, electric service systems, water supply systems, toilet system, movable equipment, classroom illumination and placement. When I refer to site, I am speaking of location, topography, and provisions for use." (Testimony of Dr. Paul F. Lawrence.)
[8] In addition to the evidence in the record for the year 1949-1950, we note similar disparities for teachers' salaries in the appropriation acts of 1947, Vol. 46 Laws of Del.Ch. 67, and 1945, Vol. 45 Laws of Del.Ch. 23.